# THOMAS R. RILEY LUMBER COMPANY *v.* McHARG.

DIRECTION OF VERDICT; CONTRACT TO PROCURE LOAN; PERFORMANCE; OFFER AND ACCEPTANCE.

1. A motion by defendant at the conclusion of all the testimony, for an instructed verdict, should be granted, where the evidence, construed most favorably to the plaintiff, has no tendency to disclose a cause of action in his favor. (Citing *Shinn* v. *Evans,* 37 App. D. C. 304; *Gloria* v. *Washington Southern R. Co.* 30 App. D. C. 559; *Baltimore & O. R. Co.* v. *Miller,* 37 App. D. C. 218; and *Rodier* v. *Life Ins. Co.* 32 App. D. C. 159.)

2. A contract to procure a loan on timber property, to be secured by the timber, plant, and land if a specified sum was procured, but, if a stated smaller sum was obtained, to be secured by the timber and plant only, is not performed by procuring a person ready to loan the smaller sum if secured by the timber property including the land. (Mr. Justice ROBB dissenting.)

3. An offer and acceptance is not shown by a letter to his principal from one employed to procure a loan on timber lands, giving an account of interviews by the agent with people who handle loans on timber lands, and asking for information, and finally stating that if the latter is furnished he feels encouraged to say that they will make the loan; and a telegram from the principal accepting the proposition in the letter with one or two immaterial modifications; since nothing is offered by the letter, and the acceptance is not absolute, but conditional. (Mr. Justice ROBB dissenting.)

No. 3072.   Submitted December 11, 1917.   Decided March 4, 1918.

HEARING on an appeal from a judgment of the Supreme Court of the District of Columbia, on verdict, in an action on a contract.                                   *Reversed.*

The COURT in the opinion stated the facts as follows:

Ormsby McHarg sued the defendants, Thomas R. Riley Lumber Company, Incorporated, and Thomas R. Riley, appel-

lants here, to recover $25,000 on the theory that he had performed a contract with them, made in the early part of 1913, for the procurement of a loan on certain timber lands in North Carolina which they claimed to own. At the conclusion of all the testimony the defendants moved for an instructed verdict, which was denied. The jury returned a verdict for the plaintiff in the sum prayed for.

*Mr. Jesse Wilson, Mr. Joseph W. Cox, Mr. Joseph T. Sherier,* and *Mr. A. E. L. Leckie* for the appellants.

*Mr. Justin Morrill Chamberlain* and *Mr. John C. Gittings* for the appellee.

Mr. Chief Justice SMYTH delivered the opinion of the Court:

The one question presented is whether the court erred in refusing to give the peremptory instruction. It did not unless the evidence, construed most favorably to the plaintiff, had no tendency to disclose a cause of action in his favor. In determining this we must give him the advantage of every inference fairly deducible from all the testimony, but if, when this is done, there is not enough to sustain the verdict, the case must be reversed, but not otherwise. *McDermott v. Severe,* 202 U. S. 601, 50 L. ed. 1162, 26 Sup. Ct. Rep. 709; *Shinn v. Evans,* 37 App. D. C. 304; *Glaria v. Washington Southern R. Co.* 30 App. D. C. 559; *District of Columbia v. Moulton,* 182 U. S. 576–582, 45 L. ed. 1237–1241, 21 Sup. Ct. Rep. 840; *Randall v. Baltimore & O. R. Co.* 109 U. S. 478, 27 L. ed. 1003, 3 Sup. Ct. Rep. 322; *Baltimore & O. R. Co. v. Miller,* 37 App. D. C. 218; *Metropolitan R. Co. v. Moore,* 121 U. S. 558, 30 L. ed. 1022, 7 Sup. Ct. Rep. 1334; *Delaware, L. & W. R. Co. v. Converse,* 139 U. S. 469, 35 L. ed. 213, 11 Sup. Ct. Rep. 569; *Elliott v. Chicago, M. & St. P. R. Co.* 150 U. S. 245, 37 L. ed. 1068, 14 Sup. Ct. Rep. 85; *Union P. R. Co. v. McDonald,* 152 U. S. 262, 38 L. ed. 434, 14 Sup. Ct. Rep. 619; *McGuire v. Blount,* 199 U. S. 142, 50 L. ed. 125, 26 Sup. Ct. Rep. 1; *North Pennsylvania R. Co. v. Commercial Nat. Bank,* 123

U. S. 727, 8 Sup. Ct. Rep. 266; *Rodier* v. *Life Ins. Co.* 32 App. D. C. 159. In the *Converse Case* Mr. Justice Harlan said, with respect to the power of a court to take a case from the jury: "But it is well settled that the court may withdraw a case from them altogether and direct a verdict for the plaintiff or the defendant, as the one or the other may be proper, where the evidence is undisputed or is of such conclusive character that the court, in the exercise of a sound judicial discretion, would be compelled to set aside a verdict returned in opposition to it." And in the *Commercial Bank Case,* the court ruled: "It would be an idle proceeding to submit the evidence to the jury when they could justly find only in one way." Mr. Justice Robb, in the *Rodier Case,* said: "At the close of plaintiff's case, the evidence showing that the deceased had made statements which constituted a breach of warranty was undisputed, and there was no evidence tending to show a waiver by defendant of such breach. The action of the court in directing a verdict was therefore obviously correct." Of course it follows from the doctrine of these cases that, where the cause is submitted to the jury and it finds against the uncontradicted evidence, the verdict should be set aside.

Studying the record in the light of this doctrine, did the plaintiff produce any evidence tending to show that he had performed his contract? To answer this we must first ascertain what the contract was. He testified that Riley, representing the defendants, and his agent Rankin, in February, 1913, submitted to him a "paper" outlining what the defendants wanted; that they desired a loan of $650,000, some of it to be used to erect a mill which would cut 150,000 feet of lumber a day; that he explained to Riley "why that was not feasible and that it would be useless for witness to undertake the proposition unless left free to handle features of the financing, as the bonding house would not lend enough of money to erect a mill of that capacity, inasmuch as Riley also undertook to erect planing mills, etc., because $650,000 would not do these things and provide a working capital; that Riley and Rankin then agreed that witness "should be free to discuss that with the bonding house, and that they would consent to any figure

agreed upon by witness and the bonding house to be the most economical plant, and to work the thing out and he [Riley] would consent to it. The defendant agreed in the paper presented to personally guarantee the loan. If it is not in the paper, it was later done." It is not "in the paper" produced by him; on the contrary that paper says, "There are no personal guarantors on the loan." He further testified: "The defendant agreed to pay the plaintiff $25,000, the payments to be made in the form specified in the complaint." Towards the close of plaintiff's testimony this appears:

"The court then asked the following question:

" 'Q. Do you claim that at the time you were having conferences in Washington, he [Riley] agreed if you could not get more than $500,000 that would be satisfactory as to the amount of the loan?

" 'A. Yes, and the letter will show, which seems to settle that point.

" 'Q. The Court: Let Mr. McHarg point to the letter to which he refers and in which he says Mr. Riley said he would be satisfied with the $500,000 as the amount of the loan.'

"Whereupon the witness referred to letters of March 11th and 15th, from Rankin to him." There were two letters on the first date; one is known as the "shorter letter" and that is the one, the record discloses, to which McHarg referred. In these letters, then, according to McHarg, is where we are to find the contract.

The shorter letter written to McHarg by Rankin, who conducted all the correspondence in behalf of the defendants, says: "In order that you may be definitely and fully informed as to Mr. Riley's attitude in this matter, I beg to report that he authorizes me to say that he will accept a loan of $500,000 (if it is impossible for you to do any better), provided the lenders will agree to have the bonds secured by the timber and plant only, and not by the land. This is on the basis of 200,000,000 feet of timber 10 inches and better at the cutting point, and his further condition is that if the new cruise shows more than 200,000,000 feet then the lenders must let him have an

amount above $500,000 as would be represented by the excess above 200,000,000 feet at $2 per thousand. The final condition being that the bonds are to be secured by the standing timber, the plant, and the land, if the new cruise shows enough timber in excess of 200,000,000 feet to bring the loan up to $650,000 when the excess is counted in at $2 per thousand." The material parts of the letter of the 15th are: "If you can secure a bond issue of $500,000 or $525,000, Mr. Riley will pay you individually $5,000 cash when the bonds are issued; and he will give you two notes for $10,000 each, payable respectively in one and two years. If you can secure a loan of $650,000, he will pay you individually $5,000 cash when the bonds are issued; and he will give you two notes of $10,000 each payable, respectively, in one and two years, and also a further note for $25,000 payable in three years. * * * The foregoing supersedes and takes the place of all previous verbal or written propositions concerning compensation to you; and is to constitute your entire fee or commission in the matter so far as either the company, Mr. Riley, or myself is concerned. * * * I therefore very much hope that we are going to be able to consummate this deal; and that you will be able to persuade the lenders to accept the proposition contained in my shorter letter of the 11th instant, which seems to me to be entirely fair." Thus he makes the "shorter letter" a part of this letter. Put in brief terms, the contract disclosed by these letters is that McHarg was employed to secure a loan of $500,000, or more if possible; that if it did not exceed $500,000 it should be secured by the timber and plant *only*, and not by the land; that if he secured $500,000 or $525,000 his compensation was to be $25,000; that if he obtained $650,000 his compensation was to be $50,000.

McHarg endeavored to obtain a loan in New York, and failing there, went to Chicago. Considerable correspondence between him and Rankin was held besides what we have set out; but for the present we put it out of sight as immaterial so far as the contract is concerned. Soon it developed that Riley did not have title to the land or the timber and was unable to procure it. This, of course, ended McHarg's endeavors to get the

loan. It is significant that up to this time McHarg had not notified Rankin, Riley, or anybody for them, that he had found a person able and ready to make the loan; but, upon learning of Riley's lack of title and inability to procure it, he wrote: "As a result of my work the transaction could be and would be financed by this house had it not suddenly developed that neither Mr. Riley nor the timber company has title to the property, in spite of the representations which I have just quoted." This, it will be observed, does not state the amount of the loan which he had secured, if any, whether it was for $500,000, $525,000, or $650,000, nor does it say whether the loan was to be "secured by the timber and plant only, and not by the land." It simply declares that he had procured a bonding house "amply able to finance the undertaking," and that "it would be financed by this house."

The only other testimony on this question is that given by Frederick R. Hill, who said that he was located in Chicago and engaged in the business of placing bonds and mortgages, especially bonds secured by timber in the southern states; that McHarg had "presented to him the outlines of a timber bond issue" and made certain representations with respect to the lands owned by Riley; that they discussed the matter in detail; told McHarg he would *negotiate* the bond issue if the representations made by Riley were true, namely, if the defendants had good title to 30,000 acres more or less of virgin timber which contained, as disclosed by reliable cruises, "more or less, 220,000,000 feet of merchantable timber," and if defendants "would enter into a proper binding agreement to devote the said proceeds of said timber bonds for the purpose of constructing and equipping a  *  *  *  sawmill, planing mill, and dry kilns  *  *  *  to adequately cut, manufacture, and market said timber." He further said that he told McHarg that at that time "he was prepared, ready, and able, to negotiate said $500,000 issue of bonds on the above conditions, and requested McHarg to have the questions answered." The questions referred to were *forty-one* in number and were accompanied by a letter from Hill to McHarg, which said: "I am inclosing herewith a list of questions in regard to the proposed

timber bond deal on North Carolina timber.  *  *  *"  Among the questions were these:

"17. State how many miles of logging railroad will have to be built to reach the timber, and how many miles of road will be built into the timber from the proceeds of this issue, and how many years' cut the amount of road built will take care of.  Will the logging railroad be a separate corporation from the lumber company?"

"18. Send us statement showing what the lumber will cost f. o. b. at the mill.  *  *  *"

"22. Will the borrowers guarantee the bonds?"

"23. State the financial condition of the borrowers who will give guaranty, giving their names and addresses."

"26.  *  *  *  On this point we would like to get a frank statement of how much they [the Rileys] think they can take care of on the first maturity and the maturities that follow. *  *  *"

"40. Will the logging road have any permanent value after this timber is cut?  *  *  *"

"41.  *  *  *  Give a general summary of the value of the security behind the bonds, somewhat as follows:  *  *  *"

Many of these 41 questions were outside of any representation made by Riley.  Riley, in his representations, made no reference to the building of a logging railroad; expressly stated, in the paper handed to McHarg detailing what he wanted and was willing to do to secure it, that there were to be "no personal guarantors on the loan;" said nothing about taking care of the maturities, except the interest coming due for the first three interest periods (six, twelve, and eighteen months), or about the cost of lumber f. o. b. at the mill.  None of the questions was answered before negotiations were broken off.  They dealt with important matters.  Clearly they were asked for the purpose of enabling Mr. Hill and his clients to determine whether or not they would make the loan.  Until they were answered satisfactorily, it could not be said that McHarg had found persons ready and willing to take the bonds and advance the money.  And this being so, he had not then performed his contract.

But perhaps we should put these questions out of view and consider only Mr. Hill's statement as to the conditions upon which he was willing to "negotiate the loan," because that would be more favorable to the plaintiff's theory; and we are bound, as before observed, to take the view which will advantage McHarg most.

Mr. Hill, as we have seen, said that he was able and willing to negotiate a bond issue for $500,000 upon condition: (a) That Riley owned in fee 30,000 acres of timber land more or less; (b) that he could secure leases of several thousand acres more; (c) that a cruise made in 1912 showed 220,000,000 feet more or less of merchantable timber standing on the land; and (d) that Riley would bind himself to devote the proceeds of the loan for certain purposes.

It will be noticed that he did not say specifically that the land was to be a part of the necessary security, but neither did he specify that the timber or any of the other property was to be; yet it is clear that both were to be. About this reasonable minds could not differ. Now bearing these conditions in mind, let us compare them with the terms upon which McHarg was authorized to act for Riley, as those terms appear in the letters of the 11th and 15th of March, which, according to McHarg, are to be taken as conclusive evidence of the contract he had with Riley. In the letter of the 11th he was authorized to "accept a loan of $500,000 if it is impossible for you [him] to do any better, providing the lenders will agree to have the bonds secured by the timber and the plant only, and not by the land." But Hill was not willing to negotiate the loan except upon the theory that the security would cover not only the timber and plant, but *also* the *land*. The letter of the 11th further provided that, "if the new cruise shows more than 200,000,000 feet, then the lenders must let him [Riley] have an amount above $500,000 as would be represented by the excess of 200 million feet at $2 per thousand." Hill's proposition required "more or less 220,000,000 feet" for the loan of $500,000. The letter concludes thus: "'The final condition being that the bonds are to be secured by the standing timber, the plant, and the land, if the new cruise shows enough timber

in excess of 200,000,000 feet to bring the loan up to $650,000 when the excess is counted in at $2 per thousand." Hill, however, required, as we have just observed, that the *land* should be included in the security for the $500,000 loan. Other material differences might be pointed out, but these are enough to show that Mr. McHarg had not secured a person ready to make a loan upon the conditions embraced in his contract.

At the bar and in the briefs, a great deal of importance was given by both sides to a letter written to Rankin by McHarg from Chicago on the 13th of March, and a telegram received from the former by the latter in response thereto. The letter, it is said, contained an offer from McHarg to secure the loan upon certain conditions therein named, and the telegram an acceptance of the offer. We cannot assent to this. The letter gives an account of interviews which McHarg had "with people here who handle timber lands," says they "would like to have a guaranty outside of the security" furnished by the property, that the loan would be paid; it enumerates several other pieces of information desired, and follows with this statement: "I feel encouraged to say to you that if these things can be worked down in a business form along the lines indicated, the people with whom I have been talking will take a bond issue not to exceed from $500,000 to $525,000 on this property." And then concludes with the assertion that if Riley could not "see his way clear to let us work the matter out on substantially the lines above set out, it will be necessary for me to drop out of the transaction." In the telegram Rankin said: "Riley accepts proposition your letter 13th with one or two immaterial modifications. Writing you fully New York." McHarg had made no offer. He related interviews and asked for information. And said that if the latter was furnished he would "feel encouraged." But this was not such an offer as, if accepted, would constitute a contract. *Rankin v. Collins,* 40 App. D. C. 211. The word "accept" in the telegram was inapt. Obviously one cannot accept unless something is offered. And McHarg had offered nothing except some intelligence and an expression of hope. The telegram, interpreted in view of the letter, as it

should be, meant that Riley would do the things and supply the information referred to in the letter, and that was all.

Even if the letter should be construed as an offer, the acceptance was not sufficient to constitute a contract. Such an acceptance must be absolute, not conditional. *Eliason* v. *Henshaw,* 4 Wheat. 225, 4 L. ed. 556; *First Nat. Bank* v. *Hall,* 101 U. S. 43, 25 L. ed. 822; *Minneapolis & St. L. R. Co.* v. *Columbus Rolling Mill,* 119 U. S. 149, 30 L. ed. 376, 7 Sup. Ct. Rep. 168; *Martin* v. *Northwestern Fuel Co.* 22 Fed. 596; *Clark* v. *Burr,* 85 Wis. 649, 55 N. W. 401. In the *Minneapolis & St. L. R. Co. Case,* it was said: "A proposal to accept, or an acceptance, upon terms varying from those offered, is a rejection of the offer, and puts an end to the negotiation, unless the party who made the original offer renews it, or assents to the modification suggested."

In addition to this, it must be remembered that McHarg was Riley's agent, and therefore bound to the exercise of the strictest fidelity towards him in performing his contract of brokerage. *Mannix* v. *Hildreth,* 2 App. D. C. 259; *Rawlings* v. *Collins,* 36 App. D. C. 72; *Forrest* v. *Wardman,* 40 App. D. C. 520; 4 R. C. L. 270; and 9 C. J. 536. In this view, was he not bound to await the letter referred to in the telegram? In fact this is what he did, as we show later.

Appellee, in his brief, says that it was agreed at the first conference between himself and Riley that, if he could not get more than $500,000, that would be satisfactory as to the amount of the loan, and he refers for proof of this to his statement in answer to the questions of the court referred to above, but in those answers he said that the letters of March 11th and 15th would show what the agreement was; that they would "settle that point." The letters then supply the test because he made them such, and they show conclusively, as we have disclosed, that if the loan was to be no greater than $500,000 the security should not include the *land.* The statement in the brief, just quoted, omits this very necessary element, namely, the extent of the security, and, hence, is not correct. The testimony of Riley is referred to by appellee, but we are not concerned at all about it, since it has no tendency to aid the

appellee. In passing we may remark that the theory now advanced by appellee as to what the agreement was, is in direct conflict with his letter of March 13th, already referred to, in which, after relating an interview which he had with people "who handled timber bonds," he said that they took his view of the matter, namely, that the property would not carry $650,000; that his "conclusion upon the whole matter was that they would handle the transaction if the bond issue did not exceed * * * from $500,000 to $525,000;" and that if Riley did not see his way clear to agree to this "it will be necessary for me to drop out of the transaction." If McHarg had, as now asserted, a contract to the effect that Riley would be satisfied with $500,000 secured by the timber *and land,* if he could not get more, why say that, if Riley would not consent to a loan of from $500,000 to $525,000, it would be necessary for him, McHarg, "to drop out of the transaction." Brokers, or business men of any class, do not ordinarily show a willingness to yield their rights so easily. Prior to this, February 28, he wrote that "the figure—$650,000—would have to be materially scaled down," which harmonizes with the subsequent letter of March 13. We mention these statements, not for the purpose of settling a conflict in the testimony, for with that we have nothing to do, but as tending to show McHarg was right when he answered, in response to the court's questions, that the letters of March 11th and 15th expressed correctly the contract between himself and Riley.

It is further asserted in appellee's brief that, after receiving the telegram of March 15, to which we have referred, McHarg went to the Chicago bankers, "closed the deal, and returned to New York." He did not say so in his testimony. What he did say was this, that he told the bankers that the proposition which Riley had authorized him to make "had been accepted, and showed them his telegram." This is not equivalent to saying that "he closed the deal" with them. Nor does his subsequent conduct indicate that he thought he had. When he reached New York he found awaiting him the letters referred to in the telegram. Answering these, March 20, he wrote: "I also note what you say about the bonds being secured by the

timber plant only, and not by the land. This cannot be done." Other criticisms and suggestions were made by him. And in the concluding paragraph he says: "Please arrange for a conference with Mr. Riley as soon as possible. If Mr. Riley is going to be in a position to talk definitely on the points which I have brought out in this letter by Sunday, I will go down to Washington Saturday afternoon, and can see you both at the Willard Hotel." This makes it clear that he did not believe that he had "closed the deal" on the 15th. But as we have repeatedly stated, the question as to what the contract was is not open for discussion. Mr. McHarg closed it, so far as this review is concerned, when he said that the letters of the 11th and 15th would settle the point.

Having firmly in mind that this court will not set aside the finding of a jury on a question of fact except where it is clearly our duty to do so, we have searched the record with care for sufficient evidence to sustain the verdict in the present action, but have failed to find it. Mr. McHarg may be entitled to recover any damages he has suffered by reason of Mr. Riley's misrepresentations, but he has failed utterly to establish a performance of his contract.

For this reason the case is reversed, with costs, and a new trial ordered in accordance with this opinion. *Reversed.*

Mr. Justice Robb dissenting:

I find no fault with the abstract legal principles as stated in the majority opinion, but rather with their application to the facts of this case, which has resulted in placing duplicity at a premium and good faith at a discount. While such a result always may not be avoided, even in a court of justice, I think it is easily avoidable here. That such was the view of the experienced trial judge and the twelve disinterested jurors who passed upon the evidence adds cogency to my position. The case is unique in that not an exception was reserved to the introduction of evidence, and not a word of fault found with the charge of the court.

That Mr. McHarg was employed to negotiate a bond issue

for appellants is admitted. It also is admitted that appellants furnished him a signed statement containing "full data concerning the transaction." In this signed statement it was represented that appellants owned 30,000 acres of hard wood timber land in North Carolina; that the assets of the Riley Lumber Company consisted of this land; that Riley "owns the company himself, excepting the few shares necessary to be held by others for the purpose of creating his board of directors;" that his financial standing "would be rated at about $100,000." The loan then desired was $650,000. Mr. McHarg immediately commenced negotiations with New York bankers. He then went to Chicago, and, after spending some time with parties there who handled timber bonds, wrote Riley's agent here, Mr. Rankin, under date of March 13, 1913, and in the letter said:

"The people here take the same view of the matter that I have expressed to you from the beginning, namely, that the property would not carry a $650,000 bond issue.  *  *  *

"My conclusion upon the whole matter was that they would handle the transaction if the bond issue did not exceed $500,000. In this connection, however, they will expect that your client in lieu of the separate guaranty for the full amount of the bond issue will give his personal guaranty on the issue. I understood you to say that he was worth outside of this property from $100,000 to $150,000. It will be necessary in addition to furnish information in detail upon the following points."

In substance the points were as follows: First, a statement as to the titles; second, the experience of Riley in timber and lumber business; third, details of two cruises represented to have been made; fourth, the cost of a spur railroad to the proposed mill site; fifth, the cost of the necessary logging road; sixth, Riley's experience in marketing lumber; seventh, information as to acreage and location of lands upon which Riley had represented he held options. In short, these points merely covered statements Riley already had made. The letter concluded:

"I expect now to be in New York by the first of next week. I am planning to get there by Monday morning.

"I have written at this length so that you can transmit the transaction in all its bearings to your client, and secure his consent to letting us work the matter out on the above lines. If he cannot see his way clear to let us work the matter out on substantially the lines above set out, it will be necessary for me to drop out of the transaction."

Evidently Rankin was expecting a letter from McHarg, for on the next day, or March 14th, he wired McHarg at Chicago: "Letter not received. Will wire answer same address soon as received unless otherwise instructed." On the next day Rankin, having received McHarg's letter of the 13th and submitted it to his client Riley, telegraphed McHarg at Chicago as follows: "Riley accepts proposition your letter 13th with one or two immaterial modifications writing you fully New York."

Upon receipt of this telegram Mr. McHarg went to the bonding house with which he had been negotiating, "and told them the proposal they had authorized him to make had been accepted, and showed them this telegram." A representative of this banking house testified that McHarg came to him and presented the outlines of a timber bond issue, and stated the representations made by Riley, and that he informed McHarg he would negotiate a bond issue totaling half a million dollars "if it could be shown that the representations made by Riley were true * * * that he told Ormsby McHarg that at that time he was prepared, ready, and able to negotiate said $500,000 issue of bonds on the above conditions, and requested McHarg to have the questions answered, and gave him a form of contract to be signed by Thomas R. Riley and the Thomas R. Riley Lumber Company; that he never received any answer to these questions; that he held himself in readiness to negotiate said bond issue until he received a letter April 12, 1913, from McHarg, stating that the people who had employed him (McHarg) to negotiate this bond issue were not the owners of the land and timber in question, although written representations had been made to him that the titles were in fee simple and perfect."

When Mr. McHarg reached New York he received three

letters from Rankin, the first of which was dated March 11th and in which a willingness was expressed to accept a loan of $500,000 provided the lenders would agree to have the bonds secured by the timber and plant only. In the second letter, dated March 15th and written after receipt of McHarg's letter of the 13th, McHarg was told that if he could secure a bond issue of $500,000 or $525,000 Riley would pay him $5,000 cash and give him two notes, each for $10,000, payable in one and two years. The letter also contained the following: "The foregoing supersedes and takes the place of all previous verbal or written propositions concerning compensation to you; and is to constitute your entire fee or commission in the matter so far as either the company, Mr. Riley, or myself is concerned." In the third letter, written the same day and apparently contemporaneously with the second, Rankin said: "Your letter of the 13th instant did not reach me until this morning, and after consulting with Mr. Riley I have sent you the following telegram." Then followed the telegram accepting the proposition submitted in McHarg's letter. The letter then gave detailed answers to the questions asked in McHarg's letter, and then there were made known the "one or two immaterial modifications" mentioned in his telegram to McHarg, which were that the bond be secured by the standing timber and plant only, and that if a new cruise should show more than 200,000,000 feet a proportionately larger amount be loaned.

Mr. McHarg, responding to these letters, acknowledged receipt of the answers to the questions previously submitted, and then said: "I also note what you have to say about the bonds being secured by the timber plant only, and not by the land. This cannot be done. * * * I consider your letter of the 11th instant has so materially modified your first representations to me, that I must hear from you in response to this letter before I can submit any of your data to the Chicago brokers." Rankin, on the day after the receipt of this letter, wrote McHarg that he had submitted it to Riley; that he "hoped to have the matter in much better shape within a few days." On March 17th McHarg received from the Chicago brokers a form of contract and a supplemental list of questions, both of

which he immediately forwarded to Rankin, who under date of March 19th replied that within two or three days he would prepare and send to McHarg "a full statement in response to the list of questions." Let it be noted here that, notwithstanding the attitude of the majority of the court with reference to the questions submitted by the brokers, neither Riley nor his agent Rankin ever expressed the slightest objection to them. On March 29th Rankin again wrote McHarg that "some domestic complications" had arisen between the parties which he thus far had been unable to straighten out, but that he hoped they would "come around in satisfactory shape, in a very few days;" and if they did he thought there would be "no trouble whatever in completing it (the transaction) with your people." It soon developed that the Riley Lumber Company, which had been represented as the owner of the 30,000 acres of land, did not own a foot of it, and that the whole scheme was to borrow the money and buy the land, rather than to cut and market the timber on land already owned. Naturally the transaction ended there.

Of course McHarg had a right to rely upon the representations which had been made to him by Riley and his agent Rankin. He went to Chicago, and made known those representations to the bonding house, and was told that if they could be substantiated a bond issue of $500,000 would be negotiated. Thereupon McHarg submitted the proposition in detail to his client, and received in reply a telegram accepting it "with one or two *immaterial* modifications." Surely McHarg had a right to take his client at his word, and to assume that the "immaterial" modifications related to matters of detail only, and not to substance. He went back to the bonding house with the telegram, and a representative of that bonding house under oath says that he was "prepared, ready, and able to negotiate said $500,000 issue of bonds" on the conditions mentioned in McHarg's letter to his client. Had this telegram read, "Riley accepts proposition your letter 13th writing you fully New York," could it be doubted for a moment that McHarg would have been entitled to his commission when the bonding house received notice of it? Questions had been submitted

with McHarg's letter, and McHarg had a right to understand that answers to those questions would be found in the letter which was to be forwarded to New York. The purpose of the telegram very evidently was to enable McHarg to close the deal before leaving Chicago, and this he did so far as he was concerned. Surely it may not be said that a failure thereafter on Riley's part to make good the representations upon which he had authorized McHarg to act released him from responsibility to McHarg. This is an issue between McHarg and Riley, not between Riley and the bonding house, a point the majority opinion entirely overlooks and disregards. In *Dotson* v. *Milliken*, 209 U. S. 237, 52 L. ed. 768, 28 Sup. Ct. Rep. 489, the syllabus reads in part as follows: "A broker employed to sell land subject to a requirement of the purchaser which the vendor declares will be complied with is entitled to his commissions if the sale falls through solely because the vendor's representations are inaccurate." In the opinion the court says: "It is urged, faint heartedly, that a binding agreement was necessary before a commission was earned. This is not the prevailing view, and could not be the law in a case like this, where the jury must have found the defendant liable on a contract with the broker that might be performed before an absolute agreement with the purchaser should be reached." In the present case the most material representations made to Mr. McHarg were false, and known to be false by Mr. Riley when he made them. Mr. McHarg, on the contrary, acted throughout in good faith. The reason, and the sole reason, for the failure of the enterprise, was the bad faith of Riley, and yet he has been permitted to escape the consequences. The exceptionally clear, fair, and comprehensive charge of the learned trial justice, to which, as I have said, no exception was taken, renders it unnecessary for me further to extend this discussion.

I dissent from the opinion and judgment of the court.

A motion for rehearing was denied March 30, 1918.

Mr. Justice SIDDONS, of the Supreme Court of the District of Columbia, sat with the Court in the hearing and determination of this appeal, in the place of Mr. Justice VAN ORSDEL.