DELAWARE, L. & W. R. CO. v. DEVORE.

(Circuit Court of Appeals, Second Circuit. March 10, 1902.)

No. 70.

1. POSITIVE AND NEGATIVE TESTIMONY—WEIGHT—INSTRUCTIONS.

A requested instruction that positive testimony of witnesses that a whistle was blown and a bell rung is entitled to more weight than testimony of other witnesses that they did not hear the one or the other is too broad, without reference to the credibility of the witnesses in other respects.

2. NEGLIGENCE OF PARENTS—IMPUTING IT TO CHILD—DRIVERS.

Negligence of the father, as well as of the mother, in not discovering a train, is imputable to a child, held in the arms of his mother, who was sitting by the side of the father, who was driving, as the father is not acting as a driver merely.[1]

3. PERSONAL INJURIES TO CHILD—DAMAGES.

A child made a mental and physical wreck may recover of the one by whose negligence it was caused, not only for physical suffering, but for loss of earning capacity.

In Error to the Circuit Court of the United States for the Southern District of New York.

Writ of error to review a judgment rendered by the circuit court for the Southern district of New York upon a verdict against the Delaware, Lackawanna & Western Railroad Company for the sum of $10,000 in favor of the plaintiff in an action to recover damages for personal injuries sustained by him at a grade crossing known as "Hope Crossing," on the line of the defendant's railroad in New Jersey, on the evening of November 22, 1892.

Hamilton O'Dell, for plaintiff in error.

Walter K. Barton, for defendant in error.

Before WALLACE and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge. At the time of the injury the plaintiff was about one year and four months old. His parents had been living at Wallpack, N. J. On the morning of November 22, 1892, they drove from their home with this child to Belvidere, N. J., a distance of about 26 miles from Wallpack, and about 6 o'clock in the evening started to return home. On their way to Belvidere they had crossed the railroad track at Hope crossing, but Mrs. Devore (now Mrs. Heater) had never driven on that road before, and did not know that her husband had, and did not know the name of the railroad which they crossed. They were in a smoothly running top buggy, and had an old and gentle horse. The father drove the horse, and was seated on the right side of the buggy. The mother sat on the left side with the child in her arms. The evening was very dark and cloudy. "It was storming some,—a sort of hail, sleeting." The wind was on the right side of the buggy, and was blowing hard. The top part of the buggy was put down so as to prevent the wind from striking the baby. Hope crossing is about 2½ miles from Belvidere, and as they ap-

[1] Negligence imputed to infants, see note to Railway Co. v. Kowalski, 34 C. C. A. 4.

proached it Mrs. Devore asked her husband if they were not near the crossing which they had crossed in the morning. He replied, "A ways ahead," and pulled the horse down to a walk. The horse continued to walk until the crossing was reached. Mrs. Devore, from the time the horse began to walk, looked both ways and listened for the noise of a train, and testified that her husband did the same, but that she neither saw nor heard anything; heard neither bell nor whistle, and saw nothing, until, "just as we got on the tracks, I saw the glittering of the rail, and that is all I saw." Mr. Devore was injured, and has since died, and the child was terribly injured, so that he is now, and will be permanently, a mental and physical wreck. He was previously a strong, healthy child. The train had left Bridgeville Depot, about a third of a mile to the right from Hope crossing, somewhat after 7 o'clock, and at the time of the disaster was going at the rate of 40 miles an hour. It does not appear that Mrs. Devore knew of the existence of this depot or of the time when trains might be expected to pass the crossing.

The issues were as to the negligence of the defendant in disobeying the statutory requirements as to bell or whistle; as to the contributory negligence of the parents of the child in omitting to take proper precautions when approaching a railroad crossing; and, in connection with the question of contributory negligence, the question was examined whether upon a very dark and stormy evening an approaching train could be seen or heard by the occupants of a buggy as it approached the crossing. A further issue was made in the pleadings and the testimony as to the especially dangerous character of the crossing, which should have compelled the defendant to take especial precautions, other than those provided by statute, to prevent casualties of the character encountered by the Devores.

Upon the question of obedience to the statute of New Jersey, which requires the ringing of a bell or the blowing of a whistle before and until the engine of a railroad train has crossed a grade crossing, the witnesses differed; the majority in number being in favor of the defendant's compliance with the statute on the evening of the accident. The court did not charge, as requested by the defendant, as follows: "Upon the question whether the bell was rung and the whistle blown, positive testimony of witnesses that the one was blown and the other was rung is entitled to more weight than testimony of other witnesses that they did not hear the one or the other,"—and to this omission an exception was taken. The request asserts the proposition that positive testimony of witnesses is entitled to more weight than the negative testimony of other witnesses, and makes no discrimination in regard to the credibility in other respects of the two classes of witnesses. The positive class may impress the triers with lack of confidence in their trustworthiness, their disinterestedness, their accuracy; but the request establishes as a rule of law that positive testimony is entitled to superior credit whether other things are equal or not, and is, we think, a broader rule than a court should be called upon to give to a jury, without reference to the credibility of the witnesses in other respects. In reply to the following question put by the foreman

of the jury: "Supposing the jury believe that the bell was rung and the whistle sounded, and suppose, at the same time, that Mrs. Heater used her best diligence in trying to see whether the train was coming or not, does that relieve the railroad from responsibility?" the court said: "If they rang the bell and sounded the whistle they are relieved from responsibility, unless you reach the conclusion that the crossing there was such a peculiarly hazardous one that it was necessary to adopt further precautions, for the reason that the sounding of bells and whistles could not be heard by travelers on the highway."

To that part of the instruction commencing "unless you reach" the defendant excepted for the reason that there was no proof before the jury showing, or tending to show, that the crossing was "a peculiarly hazardous one," or that "it was necessary to adopt further precautions, for the reason that the sounding of bells and whistles could not be heard by travelers on the highway." Much of the argument of the plaintiff in error is directed to an alleged entire or substantial absence of proof that the crossing was a peculiarly hazardous one. If peculiarly hazardous, the fact bore upon the question of the defendant's negligence. Railroad Co. v. Ives, 144 U. S. 421, 12 Sup. Ct. 679, 36 L. Ed. 485; Railroad Co. v. Moore, 45 C. C. A. 21, 105 Fed. 725. The traveled road from Belvidere as it approaches Hope crossing is a gradual ascent until the top of a hill or "rise" in the ground is reached. As the road descends there is a homestead on the right occupied by Mr. Emery, consisting of a house, barn, and other outbuildings. A few trees are in the yard. The view towards Bridgeville Depot is to some extent interfered with by these buildings. The corner of the Emery fence nearest the crossing is about 70 feet from the first rail of the north-bound railroad track. The corner of the Emery house is 127 feet distant from that rail. At 735 feet from the crossing towards Bridgeville the railroad track enters a cut, which at 855 feet from the crossing is about 5 feet above the top of the rail, and at its extreme height is about 12 or 12½ feet above the top of the rail. A defendant's witness testified that in the daytime, from a point in the highway 47 feet from the crossing towards Belvidere, the whistling post, 1,460 feet away towards Bridgeville, could be seen through the cut. A civil engineer in the defendant's employment testified that "at a point 56½ feet from the center of the north-bound track I saw an engine 550 feet. Just an engine happened to come along there, and I made those measurements. I could see the whole engine. At a point 40 feet from the track I could see the Bridgeville depot very plainly, from the intervening road. At that same point, 56½ feet, I could see part of the depot."

This testimony was not contradicted by measurements made by the plaintiff's witnesses, who relied on the testimony of one McConnell and of Mrs. Heater. McConnell's testimony was of the most importance. He testified in chief as follows:

"I have often driven and walked over this wagon road at the crossing. I have driven from Belvidere to the crossing several times. It is a crooked and winding road all the way through, up and down hill. It is crooked and winding and up and down near the crossing." "Q. What view have you got

of the railroad to the right, standing two or three hundred yards back from Hope crossing towards Belvidere? A. You can see the track at this end of the cut. Q. How much can you see? A. Just a little. You cannot see the crossing when you stand back a quarter of a mile or three hundred yards. Q. When you stand back 165 or 170 feet from the crossing, passing the Emery house towards Belvidere, at the top of the rise that exists there, can you see the crossing there? A. No. Q. How near must you be to the crossing to see? Where would you stand with reference to this house? There is a house in the angle formed by the railway and the highway, is there not? A. Yes, sir. Mr. Emery lives there in that house. He lived there at the time of the accident. Q. Where would you stand with reference to that house to see this crossing? A. About the end of his fence,—the dooryard fence. To the Court: The end towards the railroad. By Mr. Tyndall: Q. What is the reason the crossing cannot be seen before getting so close as that? A. There is a sort of a wind in the road. There are some grades too. When you stand in front of the Emery house,—directly in front of it, in the road,—or if you are seated in a buggy directly in front of the Emery house, nothing can be seen of this railroad track to the right. Mr. Emery's house and trees prevent. There are buildings in his plot of ground there besides the house. He has a barn and chicken coop down below the house. When you get to the corner of the fence towards the railroad you can see the whole of the railroad there. By the Court: Q. Where is this place? Mr. Tyndall: At the corner of the fence nearest the railroad. The Witness: I mean by that 'see the whole of it' straight ahead. You can see the crossing,—nothing else. Q. Can't you see up and down the track a little ways? A. It might be a trifle; I couldn't say exactly as to that. To the Court: You could see a trifle towards the right. By Plaintiff's Counsel: Q. Can you see the cut from that point? Suppose you just got clear of the fence, and you are seated in a buggy or walking, how far down the track towards the Bridgeville Station can you see? A. I couldn't say exactly as to that. I never took particular notice how far I could see down. I could see down a ways,—a small distance. Q. Do you think you could see to the cut? A. I would not say as to that. When you are on the crest of the hill, on the Belvidere side of the house, you can see nothing of this railroad. Q. You can see nothing of the crossing, but can you see anything of the tracks in the distance? A. You can see just a little of the track next to the cut. What I have said in regard to seeing this railroad is said with reference to the daytime. You can't see anything if it is dark. If you stopped on the top of the hill back of the Emery house, you could not see anything at night, on a dark, cloudy night. You would have to be right on the track to see anything of them on a dark, cloudy night. I have been a railroad man, and I am familiar with the lights used on the locomotive as a headlight. These headlights throw their light straight ahead. It does not give much, if any, light to the side. I do not think that on a dark night approaching this crossing from Belvidere, and looking towards Bridgeville Station in a position of safety, say about the corner of the fence, that any headlight could be seen on a locomotive coming through the cut. I do not think I could see anything in the way of a light."

This testimony could not be ignored by the trial judge, and he could not properly have prevented an inquiry by the jury as to the credibility of Mrs. Devore's testimony that she did not see or hear an approaching train, though in the active exercise of attempts to discover whether she was in danger. Neither could he have properly prevented an inquiry as to the practicability of the sight of a moving train in a dark and rainy night by a stranger to the locality, who did not know of the existence of the cut, or the Bridgeville Depot, or of the Emery house, or of her distance from the crossing. A person familiar with a locality and its surroundings may be able to take a position in the highway in the daytime from which objects can be seen which

would not be discovered in the dark by a stranger who knew nothing of the peculiarities of the road or of any obstructions to sight.

The defendant requested the court to charge as follows:

"Even if the defendant's servants failed to blow the whistle or ring the bell as the train approached the crossing, the plaintiff's mother was not thereby relieved from the necessity of exercising proper care for her own safety and the safety of the plaintiff. She was bound to look and listen before attempting to cross the track. A railroad track is a place of danger. It can never be assumed that cars are not approaching on the track or that no danger is to be apprehended therefrom."

The court charged as follows:

"Should, however. you reach the conclusion that there was negligence on the part of the railroad in running its train silently and without proper warning down on the crossing, you then come to the second aspect of the case, was there any negligence on the part of the plaintiff contributing to the happening of the accident? * * * For an infant of tender age, in the custody and care of his mother at the time. there is to be imputed to him, when he asks damages from somebody else at whose hands he has been injured, whatever negligence may have been shown by his mother, who at that time had him in custody. So the next question for you to determine is whether Mrs. Heater was or was not negligent, and whether her negligence contributed in any way to the happening of the accident. The negligence, of course, with which she is charged, is negligence in failing to watch for or to discover the presence of this train in time to warn her husband (with whom conjointly, she says, she was looking out) to stop the horse, which she says was on a walk, and might easily have been stopped within five or ten or fifteen feet of the railroad track, if either of them had seen the train. * * * It will be for you, taking all the testimony and all the assistance you have from photographs and maps, to determine, in the first place, whether it was practicable for a person approaching that road on a walk, and keeping a careful lookout, to see that train coming in the night-time, when a sufficient distance away from the track to avoid it by stopping. And, if you reach that conclusion. then it will be for you to determine whether, in view of that fact, despite her testimony here, Mrs. Heater, the guardian of the child, at the time was exercising reasonable care and prudence in approaching that crossing; because, of course, you all know that it is a rule of law that a railroad crossing—a grade crossing—is necessarily a place of danger, and persons approaching it are required to exercise a greater degree of care and caution than if they are walking or driving along a roadway, where there are no railroad trains to be met with."

The position of the defendant was properly and clearly presented to the jury.

It will be recollected that, on the return trip to Hope crossing, Devore, the father of the plaintiff, was driving, and the mother was holding the child in her lap. The court charged that, while any negligence on the part of the mother which contributed to the accident was imputable to the child, for any negligence on the part of the father, who for the moment was not so much his father as he was the mere driver of the vehicle, the child was not responsible, and he was not chargeable with the negligence of the driver. To this charge the defendant excepted. The rule of law that the negligence of the parent of a minor who is suing a third person to recover damages for an injury caused by negligence at the time of and which contributed to the injury, and while the minor was under the protection and control of the parent, is imputable to the minor, is now well settled. Lapsley

v. Railroad Co. (C. C.) 50 Fed. 181; Id., 2 C. C. A. 149, 51 Fed. 174, 16 L. R. A. 800; Morris v. Railroad Co. (C. C.) 26 Fed. 22; Holly v. Gaslight Co., 8 Gray, 132, 69 Am. Dec. 233; Little v. Hackett, 116 U. S. 366, 6 Sup. Ct. 391, 29 L. Ed. 652.

The history of the general rule with respect to the effect of the negligence of a driver upon the right of a passenger to recover for an injury occasioned by the negligence of a third person is given by Judge Sanborn in the second Lapsley decision. In the present case the father was driving, and the mother was holding the child in her arms, and the court made a distinction which had been previously approved by the supreme court of the state of New York (Hennessey v. Railroad Co., 6 App. Div. 206, 39 N. Y. Supp. 805; Lewin v. Railroad Co., 52 App. Div. 72, 65 N. Y. Supp. 49), but has not as yet been considered by the New York court of appeals (165 N. Y. 667, 59 N. E. 301). We do not see any adequate reason for the distinction. The father was the natural protector of the child, and was bound to the exercise of prudence and care for his welfare. The child was also, if he could exercise thought on the subject, bound to yield himself to the protecting care and control of the father, whose care was his care and whose negligence was his negligence. The father was not acting as driver merely, but was also acting as father and caretaker of his child, and his negligence, if it existed, was as imputable as the mother's to the child. There is no evidence on the subject of the father's conduct except that which was given by the mother, but the exception was of importance, and for the error, though perhaps inconsequential, the judgment must be set aside.

Upon the subject of damages the court charged as follows:

"The child would be entitled, in the event of recovery, to compensation for the pain and suffering that it has endured, and to such reasonable and proper compensation as may make up to it the loss of earning capacity which it has sustained in consequence of the accident, if you reach the conclusion that the accident was the cause of the present condition of affairs. With regard to that, it is not a matter as to which any calculation of dollars and cents can be given to you. It has got to be intrusted to your discretion, and in such a matter you are required to be reasonable and just."

To this part of the charge the defendant excepted.

The complaint had alleged that by reason of the injury caused by the act of the defendant the plaintiff's life and prospects were ruined. If the collision was caused by the negligence of the defendant, there is no doubt of the truth of the averment. At the time of the trial he was about 10 years old, and it was apparent that his mental and physical capacity had been permanently ruined. We see no adequate reason why the loss of his earning capacity should not have been taken into account by the jury as well as his physical suffering.

The judgment is reversed, with costs, and a new trial is directed.