## CANADIAN PAC. RY. CO. v. SLAYTON.

Circuit Court of Appeals, Second Circuit.
December 10, 1928.

No. 68.

Walter H. Cleary, of Newport, Vt., and J. W. Redmond, of Brooklyn, N. Y., for plaintiff in error.

Charles A. Shields and David S. Conant, both of St. Johnsbury, Vt., for defendant in error.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge. On October 16, 1926, defendant in error's intestate and two other residents of Montpelier, Vt., started on a deer-hunting expedition in New Hampshire. They took a much-traveled highway to St. Johnsbury, Vt., arriving there about midnight. After stopping at a restaurant in St. Johnsbury, and later at an oil station at the corner of Railroad street and Portland street, 200 feet away from the Portland street railroad crossing, they attempted to cross and were struck by a train, and defendant in error's intestate was killed. Plaintiff in error's tracks run north and south. Portland street runs about east and west. The train was bound south from Quebec, Canada, to Springfield, Mass. St. Johnsbury has a population of over 7,000 inhabitants. The highway leading to the crossing over which the intestate passed had a down grade of about 10 per cent. Proceeding at about 10 miles an hour, the intestate looked and listened for approaching trains as he neared the crossing. It was raining, and there was mist at the time; the street was damp and somewhat slippery. The automobile lights were on. Near the crossing there was an electric light, which brightly lighted the crossing. There were railroad gates, which were raised, but no gateman at the crossing, nor a sign indicating that the gates were not in operation at this hour—about midnight. The intestate and the other occupants of the car were not familiar with the crossing; it being stated that the intestate had crossed but four times, twice in each direction, about five months previous to the occurrence. Intestate's fellow passengers in the car said they heard no signal of the locomotive and did not see the headlight of the locomotive until within a few feet of the crossing, and immediately upon seeing the train the intestate put on the emergency brake and turned motor car to the right in an endeavor to avoid the collision. The view northerly at the crossing was obstructed. The northwest corner has a garage, which extends to within

31 feet of the nearest rail of the track. There is an outside stairway projecting easterly along the side of the garage, which further obstructs a view in a northerly direction. A high bank on the westerly side of the track, with trees, bushes, and growth, also obstructed the view northerly. The engineer, although not in the lighted area when approaching this crossing, did not see the automobile lights until within 125 feet of the crossing. He testified that he was looking for the crossing.

The law of Vermont requires this crossing to be guarded by gates, but not during the full 24 hours, and for 18 years previous to the time of the accident gates were maintained and operated 17 hours daily, but not during the hours of the night at which the railroad company operated four through passenger trains, one of which struck the intestate. The highway was much traveled, even between midnight and 1 a. m., the hour when this accident occurred. The statutes of Vermont require (General Laws, § 5173) signals at grade crossings by ringing an engine bell 80 rods from the place where the railroad crosses the road or street at grade, and that the ringing continue until the engine has crossed such roadway or that a steam whistle be blown.

■ The court submitted special questions for the jury's answer, and to one of these the jury found that a bell was rung in compliance with this statutory obligation. The plaintiff in error made no claim of having blown a whistle, relying upon the ringing of the bell. Lefebvre's Adm'r v. Central Vt. R. Co., 99 Vt. 366, 133 A. 359. In answer to a question, the jury specifically found that the train was run at a careless and negligent speed as it approached and passed over this crossing. There was evidence offered by the defendant in error that the train went at a speed of from 50 to 60 miles per hour, whereas the testimony of the plaintiff in error put the speed at 35 miles up to within 16 to 18 rods of the crossing, and that it was then reduced to from 18 to 20 miles per hour. The distance the train traveled after the occurrence before it was brought to a stop, and the testimony of the defendant in error's witnesses, raised a jury question as to this claim of negligence.

■ Where the view at a crossing is obstructed, so as to make it dangerous, and at a highway which is much traveled, where gates are maintained, but not operated during certain hours of the day or night, ordinary care would require an engineer in charge of the train to pass over such a crossing at a moderate rate of speed. The speed should not be so great as to render unavailing the warning of its whistle, bell, or light, particularly where warning of the headlight is modified by another stationary electric light lamp in close proximity to the crossing, and where interfering objects prevent those who are approaching the railroad from seeing the oncoming train. If speed is desired, a watchman operating the gates should be stationed at the crossing while such trains are operated. Continental Improvement Co. v. Stead, 95 U. S. 161, 24 L. Ed. 403; Grand Trunk R. Co. v. Ives, 144 U. S. 408, 12 S. Ct. 679, 36 L. Ed. 485; Panama R. Co. v. Pigott, 254 U. S. 552, 41 S. Ct. 199, 65 L. Ed. 400; N. Y. S. & W. R. Co. v. Moore (C. C. A.) 105 F. 725; D., L. & W. R. Co. v. Devore (C. C. A.) 114 F. 155. The test is the particular danger of the crossing, even though it be in a village. N. P. Ry. Co. v. Moe (C. C. A.) 13 F.(2d) 377. The question is usually one of fact for the jury.

The plaintiff in error argues that, in view of the recent decision of B. & O. R. Co. v. Goodman, 275 U. S. 66, 48 S. Ct. 24, 72 L. Ed. 167, 56 A. L. R. 645, the intestate was guilty of contributory negligence as a matter of law and the motion for a nonsuit should have been granted. In the Goodman Case, the Supreme Court reversed a judgment for the plaintiff, saying:

"When a man goes upon a railroad track he knows that he goes to a place where he will be killed if a train comes upon him before he is clear of the track. He knows that he must stop for the train, not the train stop for him. In such circumstances it seems to us that if a driver cannot be sure otherwise whether a train is dangerously near he must stop and get out of his vehicle, although obviously he will not often be required to do more than to stop and look. It seems to us that if he relies upon not hearing the train or any signal and takes no further precaution he does so at his own risk. If at the last moment Goodman found himself in an emergency it was his own fault that he did not reduce his speed earlier or come to a stop. It is true as said in Flannelly v. Delaware & Hudson Co., 225 U. S. 597, 603 [32 S. Ct. 783, 56 L. Ed. 1221, 44 L. R. A. (N. S.) 154], that the question of due care very generally is left to the jury. But we are dealing with a standard of conduct, and when the standard is clear it should be laid down once for all by the courts."

■ But there are circumstances in the case at bar which would tend to mislead a prudent man into the conclusion that the crossing was

clear. The gates were open; the intestate was not charged with knowledge that the gates were not operated between 12 o'clock midnight and 1 a. m. There was no notice at the crossing to that effect. He was not familiar with the practice not to use the gates during certain hours. It occurred on a misty or rainy night. In the Goodman Case, the accident occurred in daylight, and the deceased was coming to a crossing with which he was familiar. There were no gates, and an obstructed view in the direction from which the train came, and he failed to stop and look. Intestate's stop within a few hundred feet of this crossing, where he purchased oil, is proof justifying the testimony of his fellow passengers that they proceeded to the crossing at the comparatively slow speed of 10 miles an hour. When a driver approaches a crossing which has open gates, and is unaware that it is not operated at all times, there is an invitation extended to him to cross, with an implied assurance that no train is approaching which he may to some extent rely upon; but, of course, he still has a duty of doing what a prudent man would do under like circumstances. Grand Trunk R. Co. v. Ives, supra; B. & P. R. Co. v. Landrigan, 191 U. S. 461, 24 S. Ct. 137, 48 L. Ed. 262; C. & O. R. Co. v. Waid (C. C. A.) 25 F.(2d) 366; Hines v. Smith (C. C. A.) 270 F. 138; Landers v. Erie R. Co. (C. C. A.) 244 F. 72; Blount v. Grand Trunk Ry. Co. (C. C. A.) 61 F. 375; Erie R. Co. v. Schultz (C. C. A.) 183 F. 673; Penn. Co. v. White (C. C. A.) 242 F. 437; D. L. & W. R. Co. v. Welshman (C. C. A.) 229 F. 82, L. R. A. 1916E, 816. In the B. & P. R. Co. v. Landrigan Case, supra, the court said:

"Gates at a railroad crossing have a useful purpose. Open, they proclaim safety to the passing public; closed, they proclaim danger; but it is manifest, if they be open or closed, regardless of safety or danger, they cannot be notice of either. * * * At times a railroad must have exclusive use of a crossing, but at such times it is its duty to close the gates. The use over it is its duty to open them, and it cannot neglect that duty and claim the same consequence as if it had been performed."

■ The defendant in error successfully distinguishes this case from Goodman's. In the instant case, on a dark misty night, after midnight, the intestate used care in listening and looking, and was invited on by the open gates and attempted to cross where a stationary electric light to some extent moderated the headlight of the locomotive which lessened the warning thereby given. These circumstances made it incumbent upon the trial judge to submit the issue of contributory negligence to the jury.

■ Complaint is made of the trial court because it permitted two witnesses to testify as to the speed of the train. They were present, with a clear view of the train as it approached, and saw its operation. They showed sufficient knowledge of the speed of moving vehicles to permit them to give an estimate of the speed of the train. There was no error in admitting such testimony.

We have examined the other errors assigned as to the charge to the jury and find no error. The other errors assigned are without merit.

Judgment affirmed.