## POKORA v. WABASH RY. CO.
### No. 4876.

Circuit Court of Appeals, Seventh Circuit.
July 6, 1933.

ALSCHULER, Circuit Judge, dissenting.

W. St. John Wines and Charles S. Andrus, both of Springfield, Ill., for appellant.

Walter M. Allen and Henry A. Converse, both of Springfield, Ill., for appellee.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

SPARKS, Circuit Judge.

Viewed in the light most favorable to appellant, the evidence submitted supports the following facts: Tenth street in the city of Springfield runs north and south. It is intersected by Edwards street which runs east and west, and at this point the accident happened. Appellee's railway tracks and station are located on Tenth street, and the station is five city blocks due north of Edwards street. At the intersection referred to appellee has four tracks. East of and parallel with the main track is one switch track and on the west of the main track there are two switches. On the north-east corner of the intersection of the streets there is located an ice plant. Its main building is flush with the west and south property lines and has a frontage of about eighty feet on Edwards street. The west property line of the ice company is parallel with the railroad tracks and is seventeen and a half feet east of the east rail of the east switch and thirty and a half feet east of the east rail of the main track. Thirty feet east of the main building, and seven and a half feet north of its south line is located the ice company's service sta-

tion which has a frontage of thirty feet on Edwards street. Fifteen feet east of the service station is a public alley running north and south. Edwards street is eighty feet in width between property lines. The traveled portion is thirty feet in width and is paved with brick to the extended west property line of the ice company, and with macadam from that point to the first railroad track. The north line of the pavement is twenty-five feet south of the south property line of the ice company, and thirty-two feet south of the loading platform of the ice service station. At the intersection of the paved portion of Edwards street and the alley, which is about one hundred and seventy-five feet east of the first railroad track, a driveway runs northwestwardly to the service station, and returns southwestwardly to the paved portion of Edwards street at about ninety feet east of the first track.

Appellant was engaged in the grocery and retail ice business and purchased his ice from the company referred to. On the morning of August 17, 1929, he left his home at 5:45 a. m. when it was daylight, and with his automobile truck drove to the ice plant for the purpose of securing ice. He decided to go across the tracks to another plant of the same company which was located at the southwest corner of Edwards and Tenth streets. A string of box cars was standing on the east switch track at a point from forty-two to forty-eight feet north of the center of Edwards street. At that time the scoring machine composed of eight saws (used for sawing ice) was running and caused a loud singing noise which could be heard for the distance of a city block. Before entering upon the tracks, appellant stopped his truck at a point from ten to fifteen feet east of the east switch. He remained in the truck and without stopping his engine looked north and south and listened for trains. Not hearing or seeing any, he drove across the switch track and upon the main track and was there struck by a south bound passenger train which had stopped at the station and was then traveling at an estimated speed of from twenty-five to thirty miles per hour without sounding the bell or whistle. Appellant's witnesses are not in accord as to the location of the rear end of the train when it stopped. They place it at different points from barely south of Edwards street to one hundred and fifty feet below that point.

Appellant had been in the habit of getting ice from both ice houses for the past ten years and was fully acquainted with the surroundings. He usually went any time from six to seven thirty o'clock in the morning, and had crossed the tracks at that point for the purpose of getting a quicker delivery of ice very frequently. He knew that there was an early morning south bound train and had seen it pass that place on many other days. On the morning of the accident no one was in front of him at the crossing; the watchman was not there, and appellant knew that he did not come on duty until seven o'clock.

 The trial court based its peremptory instruction upon the authority of Baltimore & Ohio R. Co. v. Goodman, 275 U. S. 66, 48 S. Ct. 24, 72 L. Ed. 167, 56 A. L. R. 645, and Wabash R. Co. v. Zayac (C. C. A.) 30 F. (2d) 764. Appellant, however, seeks to distinguish those cases from the instant case by the fact that neither driver of those automobiles stopped his car before driving on the track, and by the further fact that in the Goodman case the accident occurred at a country grade crossing, and in the Zayac case it occurred three blocks inside the limits of a small city where nothing obstructed the driver's view, while in the instant case, the crossing was in a thickly settled portion of a large city where the driver was prevented from seeing the approaching train by the ice company's building and the freight cars on the switch. It may be said, however, that if appellant stopped his truck within ten to fifteen feet from the east switch, as he stated, the ice company's building could not possibly have interfered with his vision of the train.

In the Goodman case, supra, the court said, at page 69 of 275 U. S., 48 S. Ct. 24, 25:

"We do not go into further details as to Goodman's precise situation, beyond mentioning that it was daylight and that he was familiar with the crossing, for it appears to us plain that nothing is suggested by the evidence to relieve Goodman from responsibility for his own death. When a man goes upon a railroad track he knows that he goes to a place where he will be killed if a train comes upon him before he is clear of the track. He knows that he must stop for the train not the train stop for him. In such circumstances it seems to us that if a driver cannot be sure otherwise whether a train is dangerously near he must stop and get out of his vehicle, although obviously he will not often be required to do more than to stop and look. It seems to us that if he relies upon not hearing the train or any signal and takes no further precaution he does so at his own risk. * * * It is true as said in Flannelly v. Delaware &

Hudson Co., 225 U. S. 597, 603, 32 S. Ct. 783, 56 L. Ed. 1221, 44 L. R. A. (N. S.) 154, that the question of due care very generally is left to the jury. But we are dealing with a standard of conduct, and when the standard is clear it should be laid down once for all by the Courts. See Southern Pacific Co. v. Berkshire, 254 U. S. 415, 417, 419, 41 S. Ct. 162, 65 L. Ed. 335."

■ It may be true that the crossing in that case was in a country district, although the opinion does not so state, yet we are unable to understand why the rule there laid down does not apply to a crossing in a city as well as in the country; if it were otherwise a traveler would be required to exercise more care in crossing a railroad track in the country where his vision was less obstructed than in a congested city where it is more restricted. The railroad company and the traveler are each required to exercise ordinary care at all grade crossings. Ordinary care is a relative term and varies with audible and visual environment rather than with strict geographical location. The law interprets ordinary care to be that degree of care which a person of ordinary prudence, under the particular circumstances, is presumed to exercise to avoid injury. Such care is required to be in proportion to the danger to be avoided and the fatal consequences that may result from the neglect. Illinois Central R. Co. v. Cheek, 152 Ind. 663, 53 N. E. 641.

If appellant stopped his truck within ten to fifteen feet from the east switch, as he stated, the ice company's building could not then have interfered with his vision of the train, and the box cars constituted the only obstruction of his vision to the station, which was five blocks away. He was then twenty-eight feet from the main track and about forty feet southeast of the box cars. He could then see the main track for a slight distance north of the south end of the first box car, and that distance rapidly increased northwardly as he traveled west, so that when he reached the west rail of the switch, which was eight feet from the main track, his vision of that track was clear.

■ The charge of wilful injury is not supported by substantial evidence and we think the facts proven are well within the rule of the Goodman case. The fact that appellant stopped his car twenty-eight feet back of the main track is not sufficient to distinguish one case from the other, for if he could not see by reason of the box cars, and could not hear on account of the scoring machine and the noise of his own motor, it was his duty under the authority of the Goodman case to take further precautions.

Judgment affirmed.

ALSCHULER, Circuit Judge (dissenting).

In my judgment Baltimore & O. R. Co. v. Goodman, supra, is not here applicable. What was there said was with reference to a crossing in the country where the view along the track to one on the highway approaching the railroad crossing was partly obstructed by a building just off the railroad right of way. Here the crossing was in a populous and busy part of a large city.

Tenth street, which the railroad occupies, is 66 feet wide. In the center is the main track. East of the main track is a switch track, and west of the center two switch tracks. On the northeast corner of Edwards and Tenth streets there is a large ice house. A string of box cars was standing on the east switch track north of Edwards street, extending to within a very few feet of the north sidewalk on Edwards street. Two witnesses testified there were box cars on each of the two east tracks, but in view of the plat which appellant offered in evidence this is probably an error. In the briefs and arguments no contention is made that there were box cars on the two east tracks.

The building alone would not have obstructed the view to the north when one reached the east line of Tenth street. But the string of cars on the east track was not only an obstruction to full view north along the main track, but would have been a menace to safety to one stopping on the east track to look and listen for approaching trains, because one could not know whether at the north end of the cars there was an engine which might at any time push the cars toward the south. The cars cut off the view for any substantial distance north on the main track to one approaching from the east until he came past the overhang of the standing cars; and, since one driving an automobile is some distance from its front, the front of the car would be very close to, if not upon, the east rail of the main track before the driver of the car would have full view north.

Had appellant gone forward upon the switch track before stopping to look and listen, he would have encountered the new danger of possible movement of the string of box cars. He stopped just before reaching that track, and several automobiles behind him stopped also. There he looked and listened,

and, seeing no danger and hearing no warning, proceeded to cross. With the necessary momentum acquired to reach the place where he did have full view north on the main track, it is at least problematic whether on reaching the switch track he could have stopped the car in time to avoid the collision, even if he then saw the approaching train a few rods away.

It appears in the Goodman case that, when the building which would obstruct the view from farther back had been passed, there was full view of the track, and time to stop before reaching it. Quite different in this respect is the case at bar, where, after passing the building, there were yet the box cars which obstructed the view and prevented stopping to look and listen at any place nearer the main track than that at which appellant did stop.

True, appellant was familiar with this crossing. He lived some distance east of the tracks, and in his business required ice daily. When, as he often did, he came early in the morning for ice, he usually got his supply from the ice house just east of the tracks. But this was an unusually busy morning. The state fair was in progress, and the platform where most generally he got his ice was occupied by others who preceded him there for the same purpose. He was told by the man in charge that it would be twenty minutes before he could be served, and that he had better go to an ice house just west of the tracks, which he proceeded to do. He crossed these tracks more or less every day, but the early morning trip for ice did not usually involve the crossing of the tracks.

While he stated that he knew generally a passenger train passed there about that time, he says he did not pay attention to the train. He testified he supposed the train had already gone, or, if not, that it was late. Another witness, whose place of business gave him full view of the trains, said the train that morning was ten or fifteen minutes late and was running unusually fast. So, even if appellant definitely knew the regular time of that train, he had no means of knowing what time it would go through if it was late, if, indeed, he was not justified in assuming it had already passed.

Pokora testified that when he crossed the tracks early in the mornings sometimes there was a flagman there and sometimes there was not. He testified definitely to stopping, looking, and listening, and other witnesses abundantly corroborated him, especially those who waited behind him to make the same crossing and followed him as he proceeded across.

If, under these circumstances, and without oral or visual indication of an approaching train, the suggestion of the Goodman case were applied—that he leave his car, go forward afoot to the main track to see whether a train was approaching in either direction, and then, returning to his car, start it up and drive across the tracks—it seems to me that he would be inviting disaster more probable than was reasonably to be anticipated from doing what he did. By the time he returned to and entered his car, started it, and drove it to the main track, a swiftly running train, which may not have challenged his attention when he was there before, might have come upon him.

There have been quite a number of cases wherein Circuit Courts of Appeals have distinguished the Goodman case, and have supported recoveries in railroad crossing accidents where persons attempting to cross tracks in an automobile did not go to the rarely exceptional extreme of leaving the car and going forward to see if a train was approaching. Among them are Chesapeake & O. Ry. Co. v. Waid, 25 F.(2d) 366 (C. C. A. 4); Norfolk & W. Ry. Co. v. Holbrook, 27 F.(2d) 326 (C. C. A. 6); Canadian Pac. Ry. Co. v. Slayton, 29 F.(2d) 687 (C. C. A. 2); Leuthold et al. v. Penn. R. Co., 33 F.(2d) 758 (C. C. A. 6); Teague v. St. L. S. W. Ry. Co., 36 F.(2d) 217 (C. C. A. 5). In the first and last of these cases certiorari was applied for and denied. Chesapeake & O. R. Co. v. Waid, 278 U. S. 629, 49 S. Ct. 29, 73 L. Ed. 547; St. Louis S. W. R. Co. v. Teague, 281 U. S. 733, 50 S. Ct. 248, 74 L. Ed. 1149.

Proof of appellee's negligence was manifestly sufficient to send that issue to the jury. To an unusual degree of certainty the evidence for appellant shows that no bell was rung or whistle sounded, and no alarm whatever given of the approaching train. I believe that under these circumstances, in this populous locality, at this busy crossing, where the duty of the railroad company must be reasonably commensurate with known perils, one driving across the track may, to a reasonable degree, rely upon his ascertainment of the absence of all statutory warning of an approaching train as some assurance that no approaching train is in hazardous proximity.

I believe that the evidence required submission to the jury of the question of appellant's contributory negligence, and that it was error to direct the verdict for appellee.