**ATLANTIC COAST LINE R. CO. v. JOINER et al.**

No. 14229.

United States Court of Appeals Fifth Circuit.

June 26, 1953.

Rehearing Denied Aug. 11, 1953.

H. H. Perry, Jr., Jesse W. Walters, Asa D. Kelley, Jr., M. B. Peacock and Peacock, Perry & Kelley, Albany, Ga., for appellant.

Robert Culpepper, Jr., Camilla, Ga., for appellees.

Before HOLMES, STRUM and RIVES, Circuit Judges.

RIVES, Circuit Judge.

This is an appeal in two railroad crossing cases consolidated for trial and which were founded upon a collision between the automobile of appellee and the train of appellant at a grade crossing at Fannin Springs, Florida, around 8 a. m. on March 3, 1950. C. W. Joiner, Jr., brought action for the recovery of damages for the death of his wife and loss of services and expenses incurred by reason of injury to his minor son. Wayne Joiner, a minor, by his father C. W. Joiner, Jr., as next friend, brought his action for personal injuries. The jury returned verdicts in favor of C. W. Joiner, Jr. for $15,363.00, and in favor of Wayne Joiner for $30,000.-00, and judgments were entered thereon.

The questions presented for review are whether the District Court erred in denying the defendant's motions for a directed verdict and for a judgment notwithstanding the verdict, in the admission of certain evidence, and in giving and in refusing certain instructions to the jury.

At about 4:30 on the morning of March 3, 1950, C. W. Joiner, Jr. left his home in Pelham, Georgia, by automobile en route to Winter Garden, Florida, to visit his brother, a trip of some 260 miles, accompanied by his wife and minor son, Wayne. The minor son slept in the back seat of the automobile from the time he left home until the accident and was not aware of the accident until several weeks afterwards. The morning was cool and clear and Joiner was driving with his car windows closed but the left vent slightly open. He had traveled this route only twice before in the last four or five years and was not aware of the existence of the crossing. There were some ten or fifteen railroad crossings on the entire trip and he did not recall the crossing at this place. The highway, U. S. Highway 19, was straight and level from the Suwannee River bridge to the crossing, a distance of approximately one-half mile. At the crossing the rails were flush with the pavement. At a point 225 feet from the crossing on Joiner's right side of the highway was a round railroad warning sign, following which, at a point 196 feet from the crossing, was a white square sign reading in black letters, "Stop, Fla. Law R.R. Crossing". The driver's explanation of his failure to observe either of these signs was that there were many commercial signs

along the highway at or near this point which detracted his attention from the railroad signs, and that several hundred yards beyond the railroad crossing there was visible a road intersection which attracted his attention, as he was unfamiliar with the route and had to make a decision as to which road to take at the intersection.

The automobile was going east and the train south. The area around Fannin Springs was normally a restricted speed zone area of twenty-five miles per hour, but the State patrolman who investigated the accident immediately after it happened testified that the signs warning the public of the speed restriction were not in place, having been taken down in connection with road construction. Adjacent to the railroad right of way was a wooded area which obstructed the vision of an approaching train so that, when the driver saw the train approaching, the automobile was only about 120 feet west of the crossing. He heard the horn at the same time. The driver applied his brakes, but realizing that he could not stop the car, he turned his car off the pavement, hit soft dirt, and the car turned over some 50 feet west of the tracks and thereafter struck near the front of the engine, when the engine was between 30 and 45 feet south of the crossing. The speed of the automobile before its brakes were applied was variously estimated to be between 45 and 60 miles per hour. Joiner testified that he would estimate the speed of the train to be from 70 to 75 miles per hour, but the engineer and train crew estimated it at approximately 50 miles per hour, and the speed tape on the locomotive showed 49 miles per hour. There was evidence that the train attained a speed of more than 70 miles per hour after it continued its run following the collision.

The Fannin Springs crossing is about a mile and a quarter south of a wye switch at Wilcox Station. In rounding the curve at this switch, the railroad requires the train to slow down to 40 miles per hour. South of the switch the track is straight for several miles, and on the occasion of the accident, the train had increased its speed from 40 miles per hour at the wye switch at Wilcox Station and was still increasing its speed as it approached the crossing. The engineer could not have seen an approaching automobile when the train was more than 150 to 200 feet away from the crossing, and at the speed of the train, it would have been impossible to stop the train after the automobile came into view and before the train reached the crossing. There was evidence that the brakes were not applied until the train was at the north edge of the pavement on the crossing. The evidence was conflicting as to whether the train blew after it passed the Wilcox Switch and until it got out in the open at the Fannin Springs crossing and the engineer saw the approaching automobile.

Mr. Conner, the Engineer of Traffic and Planning with the State Road Department of Florida, testified that the highway was one of the heavier traveled highways in the State of Florida, "one of our primary roads"; that in March, 1950, his Department had a device to check the flow of traffic on U. S. Highway 19 near Fannin Springs, Florida, located about three-quarters of a mile to the west of the Suwannee River bridge; that the record showed that for the month of March, 1950, there was an average of 2543 vehicles per day passing this device, and that on Friday, March 3, there were 2715 vehicles. It was stipulated that there were two passenger and two freight trains each way that used the crossing daily, or an aggregate of eight crossings per day of the highway by train. The locomotive engineer and train crew were familiar with the traffic conditions and other features of the crossing.

In a somewhat similar crossing accident, this Court has recently had occasion to review the Florida law on the question of whether the evidence justified submitting the issues to the jury, Atlantic Coast Line R. R. Co. v. Pidd, 5 Cir., 197 F.2d 153, and we do not think that it is necessary to elaborate on what was there said. Under the rules of law stated in that case, we think that the issues of negligence, contributory negligence, and proximate cause in the instant case were typical matters for jury appraisal.

C. W. Joiner, Jr. testified over the defendant's objection that on previous occasions he had driven down the highway at a speed of from 50 to 55 miles per hour and the Southland train, the one involved in this collision, would pass him, and that from such experience he formed his opinion that the train on this particular morning was going around 70 or 75 miles per hour. The court limited his testimony as to other occasions for consideration "solely for the purpose of showing the basis of his opinion here on this occasion". We think that it was within the discretion of the court to admit the testimony for that limited purpose. See Louisville & N. R. R. Co. v. Jones, 50 Fla. 225, 39 So. 485; Seaboard Air Line Ry. v. Smith, 53 Fla. 375, 43 So. 235; Canadian Pac. Ry. Co. v. Slayton, 2 Cir., 29 F.2d 687.

On the cross examination of the locomotive engineer, Mr. Cooper, by the attorney for the plaintiffs the following took place:

"Q. That crossing has no automatic signal device, does it, Mr. Cooper? A. You say had at that time?

"Q. Does it have any? A. It has now.

"Q. Did it have any then? A. No, sir.

"Mr. Peacock: We object to any evidence with reference to the crossing there at this time.

"Mr. Culpepper: I didn't elicit it.

"Mr. Peacock: He asked the witness 'Does it have any'?

"Mr. Culpepper: I certainly did not mean now.

"Mr. Peacock: I move to exclude from the evidence and the consideration of this jury that there are any signal devices there at this time.

"The Court: All right, counsel was asking him at the time of the collision.

"Mr. Culpepper: That is certainly what I had in mind, Your Honor please.

"The Witness: I'm sorry."

The defendant made no further motion for a more definite ruling of the Court or to declare a mistrial, and there appears to have been no further reference to this testimony. It seems to us that the action of the Court amounted to an exclusion of the evidence objected to and that, if a more definite ruling or a mistrial were required, the defendant should have made the motion or the request at the time. We find no reversible error in this occurrence.

We have carefully considered the oral charge of the Court and each of the given and refused charges and find no reversible error of the Court in reference to its instructions to the jury. Each of the judgments is therefore,

Affirmed.