## NORTHERN PAC. RY. CO. v. MOE.

(Circuit Court of Appeals, Eighth Circuit. June 3, 1926.)

No. 7072.

**1. Railroads ⬅⟶307(4).**

Whether reasonable care required flagman or some other means of warning travelers of approach of trains over crossing depends on character of crossing.

**2. Railroads ⬅⟶307(4).**

Although necessity for flagman or other warning at railroad crossing is usually over busy highways in cities, test is peculiar danger of crossing, though in village.

**3. Railroads ⬅⟶350(5)—Crossing in village containing five tracks held especially dangerous, warranting refusal to charge there was no issue of negligence as to lack of flagman.**

Railroad crossing in village, having five tracks and crossed by number of through trains, held especially dangerous, warranting refusal to charge jury that there was no issue of negligence as to lack of flagman or warning thereat.

**4. Railroads ⬅⟶307(4).**

Duty of having flagman or warning at crossing does not depend on situation at particular time accident occurred.

**5. Railroads ⬅⟶350(21)—Contributory negligence of wife in failing to warn husband, driving automobile over crossing, held for jury.**

Question of contributory negligence of deceased in failing to warn husband, who was driving automobile, of danger at railroad crossing, held to present question for jury, in view of short length of time and fact that she was caring for baby at such time.

In Error to the District Court of the United States for the District of Minnesota; William A. Cant, Judge.

Suit by Calmer F. Moe against the Northern Pacific Railway Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Frederic D. McCarthy, of St. Paul, Minn. (D. F. Lyons, of St. Paul, Minn., on the brief), for plaintiff in error.

John F. D. Meighen, of Albert Lea, Minn. (Meighen, Knudson & Sturtz, of Albert Lea, Minn., on the brief), for defendant in error.

Before LEWIS, Circuit Judge, and MUNGER and JOHNSON, District Judges.

MUNGER, District Judge. Calmer F. Moe brought this suit against the railway company, alleging that it negligently caused the engine of one of its passenger trains to collide with an automobile in which the plaintiff's wife was riding, and thereby inflicted injuries upon her from which she died. The railway company denied that it was negligent, and alleged that Mrs. Moe was guilty of negligence that contributed to her injury and death. A verdict was returned in favor of the plaintiff, and judgment was entered thereon.

The accident occurred on the morning of September 12, 1923, as the plaintiff was driving an automobile along a public highway crossing over the railway company's tracks in the village of Wheatland, N. D. There were allegations in the plaintiff's complaint that the defendant was negligent because it ran its train across this crossing at excessive speed, without ringing the bell or blowing the whistle of the engine, and without having any flagman, gates, or gong at the crossing, and because it negligently failed to give any signal, caution, or warning to the plaintiff and others of the approach of the train. The railway company relies upon its claims that the trial court erred (1) in refusing to instruct the jury that the evidence was not sufficient to warrant consideration of the charge of negligence, so far as it related to the absence of gates, a flagman, bells, or of some additional protection at the crossing; and (2) in refusing to instruct the jury to return a verdict for the defendant, the company claiming that the contributory negligence of Mrs. Moe was conclusively established.

[1] Whether reasonable care on the part of the railway company required a flagman or some other means of warning to travelers of the approach of trains over the crossing where this accident occurred depends upon the character of the crossing. The village of Wheatland has a population of about 200 or 300 people. It is situated in a level prairie country. The railway company's tracks run east and west through the village. The main portion of the village lies on the south side of the tracks, but there is a public school, a lumber yard, a city hall and an Odd Fellows' lodge building north of the tracks. The accident occurred where Washington street, a street running north and south, crosses over the railway tracks. This street connects with one of the principal public highways across the state. The automobile approached these tracks from the north. There are five of the railway tracks. The first one, counting from the north, is known as the elevator track. A traveler from the north would have his view to the west obstructed, to some extent, by the fact that there was a coal shed about 80 feet in length and 16 feet in width situated along the south side of the elevator track, about 6 feet south of the first track, and about 15 feet west of the traveled highway. West of the coal shed about 50 feet is a large grain elevator, about 50 feet wide, which also is about 6 feet from the first track. Upon the elevator track there are often freight cars, and at the time of this accident one was situated 10 or 15 feet east of the crossing and one or two were situated in front of the coal shed. Twenty-nine and one-half feet south from the center of the elevator track is the center of track No. 2, called the passing track. The third track is called the west-bound main track. Its center is 14 feet from the center of the passing track. The fourth track is called the east-bound track, and its center is 13 feet from the center of the third track. These two tracks are the double-track system for the through trains.

When Mr. Moe first approached this crossing, a long freight train of 50 or 60 cars going west on track No. 3 was beginning to cross Washington street. Mr. Moe stopped his automobile 10 or 12 feet north of track No. 1 and waited for the freight train to pass. A passenger train was approaching Wheatland from the west on track No. 4. As the freight train passed along track No. 3 to the west of the street, the passenger train approached the street crossing; but it was hidden from the view of the occupants of the automobile by the freight train. Mr. Moe started to drive across the tracks soon after the last car, or caboose, of the freight train had cleared the street crossing, and his car was struck by the engine of the passenger train on track No. 4.

There is a fifth track at this place of crossing, with its center about 51 feet south of the center of track No. 4. This is also known as an elevator track, and along it to the west of the street is a coal shed and a grain elevator, situated in much the same positions as those structures are along track No. 1. The railway depot building is located between tracks numbered 4 and 5, beginning about 90 feet east of the center of the street and extending for 100 feet east and west. A platform about 12 feet wide is between the depot and the south rail of track No. 4. The passing track and the two main

tracks (Nos. 2, 3, and 4) are laid upon an embankment of earth which is slightly higher than the adjacent lands. At this street crossing it was about 3 feet higher than track No. 1, and about 5 feet higher than track No. 5. The point where Mr. Moe stopped his car was somewhat lower than the elevator track, perhaps 8 or 10 inches. The view down the main line tracks from any place between the two elevator tracks is quite extensive, if no cars upon any of the tracks obstruct the view. The tracks run in a straight direction both to the east and to the west from this street crossing for many miles.

There was testimony that about 50 or 60 vehicles passed over this crossing each day, and that 15 or 20 freight trains and 16 passenger trains traveled over it each day. Two of the freight trains stopped at the station and four of the passenger trains. Trains going in opposite direction often pass each other at the crossing. Cars frequently stand upon the passing track. The accident happened at 7:30 in the morning, at a time when the sun was shining brightly. Under these circumstances, was it a question of fact for the jury whether or not the railway company owed a duty to the deceased to have a flagman, gates, a gong, or some other method of warning to travelers, in addition to any signals that the approaching train might have given, for the purpose of notifying those about to cross the tracks that it was dangerous to do so? In Grand Trunk Railway Co. v. Ives, 144 U. S. 408, 421, 12 S. Ct. 679, 684 (36 L. Ed. 485), the court stated the rule as follows:

"As a general rule, it may be said that whether ordinary care or reasonable prudence requires a railroad company to keep a flagman stationed at a crossing that is especially dangerous is a question of fact for a jury to determine, under all the circumstances of the case, and that the omission to station a flagman at a dangerous crossing may be taken into account as evidence of negligence, although in some cases it has been held that it is a question of law for the court. It seems, however, that before a jury will be warranted in saying, in the absence of any statutory direction to that effect, that a railroad company should keep a flagman or gates at a crossing, it must be first shown that such crossing is more than ordinarily hazardous—as, for instance, that it is in a thickly populated portion of a town or city, or that the view of the track is obstructed either by the company itself or by other objects proper in themselves, or that the cross-

ing is a much-traveled one, and the noise of approaching trains is rendered indistinct and the ordinary signals difficult to be heard by reason of bustle and confusion incident to railway or other business, or by reason of some such like cause—and that a jury would not be warranted in saying that a railroad company should maintain those extra precautions at ordinary crossings in the country."

[2] While the necessity for a flagman or other warning at a crossing has usually been found by the adjudged cases to exist at railway crossings over busy highways in cities, as in Panama R. R. v. Pigott, 254 U. S. 552, 41 S. Ct. 199, 65 L. Ed. 400, and Chicago G. W. Ry. Co. v. Kowalski, 92 F. 310, 34 C. C. A. 1, the test is the peculiar danger of the crossing, even if it be in a village. See New York, S. & W. R. Co. v. Moore, 105 F. 725, 45 C. C. A. 21.

The amount of travel across this crossing at Wheatland is not exactly known. In addition to the 50 or 60 vehicles passing per day, pedestrians, including a large number of school children, used it also. The view of the tracks was often obstructed by freight cars standing upon the two elevator tracks, and the sheds and elevators were permanent obstructions to the view before reaching the elevator tracks. Toward the south and west the depot obstructed the view of travelers to the east after passing the south elevator track. Cars often stood upon the passing track, and these overhung the rails, so that the traveler might not be able to see a train upon the third track, when approaching from the north, until he was within about 5½ feet of the third track. The crossing was much traveled by trains, nearly all of them through trains, not stopping at Wheatland. The number of tracks was an element of confusion, creating difficulty in determining on which one a train was approaching. There was evidence that the number of tracks could not be seen by travelers waiting before crossing any of the tracks, because the elevation of the embankment prevented a clear view of the series of tracks laid upon its top. Because trains frequently passed each other at this station while both were proceeding, the ordinary signals by whistle and bell of an approaching train could easily be misunderstood as emanating from the departing train.

[3, 4] These facts showed a crossing that was especially dangerous, and no error was committed in refusing to charge the jury that there was no issue of negligence for them to decide as to the lack of a flagman or

some other adequate warning at this crossing. The plaintiff in error, in asking that the instruction be given, stated that the evidence showed that there was no travel, at the time in the morning when this accident occurred, such as required the presence of a flagman or other special warning. The evidence does not show what amount of travel occurs about) that time of the day, but the need of a flagman or other means of warning does not depend upon the situation at the particular time that Mr. Moe started to cross the tracks. As stated in Freeman v. Duluth, S. S. & A. Ry. Co., 74 Mich. 86, 41 N. W. 872, 3 L. R. A. 594, and quoted with apparent approval in Grand Trunk Railway Co. v. Ives, referring to the situation in that case:

"The duty of maintaining a flagman at this point did not depend on the question whether Grant, in this particular instance, could by common prudence have avoided this collision or not. It depended rather upon the situation of the crossing, its relation to the travel upon the street generally, and the facilities afforded, not only the travelers on the street, but the trainmen on the cars, to avoid collisions and accidents of this kind, without a flagman to give warning of approaching trains."

[5] The railway company claims that Mrs. Moe was guilty of contributory negligence, because she failed to warn the driver of the danger of crossing the tracks. Mr. Moe testified that she did not say anything to him about driving the automobile when he started to cross, or while he was crossing. The rules as to the degree of care required of a passenger in an automobile which is about to pass over a railway crossing have been so often stated by this court that a repetition of them is not necessary. See Bradley v. Missouri Pac. R. Co. (C. C. A.) 288 F. 484, and Chicago & E. I. Ry. Co. v. Sellars (C. C.A.) 5 F.(2d) 31, 32, and cases cited.

The evidence shows that Mr. and Mrs. Moe, with their child aged nine months, recently had traveled in this automobile from Great Falls, Mont., to Southern Minnesota, and after a short visit there they were returning to Great Falls, through North Dakota, at the time of the accident. Mr. Moe had been driving the automobile, and his wife had confidence in his driving. At the place where Mr. Moe stopped his automobile, to await the passing of the freight train, neither Mrs. Moe nor her husband could see how many tracks were ahead of them. They were strangers to the road and to the crossing, never having seen it before. Mrs. Moe sat on the front seat, at the right of the driver. She held her infant child in her lap. The car was a touring car, having curtains on the side where Mrs. Moe sat. The curtain was down across the window on the side by Mrs. Moe. There was some kind of a window in this curtain, but the evidence is indefinite as to the view that Mrs. Moe could have had out of this window. The evidence also leaves it indefinite just how far the caboose of the freight train had passed over the crossing when Mr. Moe started to drive across, or how far away the caboose was when the automobile came upon the passing track, or the third track, on which the freight train was traveling. The witnesses differ in their estimates of these distances, some placing the caboose 80 feet east of the crossing as the automobile reached the passing track, and others asserting that the automobile crossed closely behind the caboose.

There is some question whether the engine of the passenger train was visible to the occupants of the automobile, if they had been watchful, before the automobile reached the third track. The automobile was traveling at about 6 miles an hour over the crossing, and the passenger train was approaching at a rate variously estimated from 8 to 15 miles per hour. In addition to any confidence that Mrs. Moe may have reposed in her husband's ability and disposition to manage the automobile safely, the evidence leaves it a fair inference that she did not have more than three seconds of time after she realized that there was another track beyond the one on which the freight train had passed before the collision occurred. In this short interval of time, if she observed the track before her, she had the right and the duty to endeavor to look in both directions, to ascertain if there was danger from an approaching train, and to endeavor to give a warning to her husband. She was also caring for the baby in her lap. It had been fretful, and she was trying to quiet it, to put it to sleep, as her husband was driving across these tracks. She was responding to one of the most natural of human impulses in giving care to the fretful child. Under these circumstances it was a question for the jury whether Mrs. Moe was guilty of contributory negligence in acting in the emergency that was so suddenly thrust upon her.

The judgment will be affirmed.