894

## HOPKINS v. BALTIMORE & O. R. CO.

### CAMPBELL v. SAME.

Nos. 6463, 6464.

United States Court of Appeals for the District of Columbia.

Decided Jan. 6, 1936.

Paul B. Cromelin, Bolitha J. Laws, Lowry N. Coe, Julian I. Richards, and Francis C. Brooke, all of Washington, D. C., for appellants.

George E. Hamilton, John J. Hamilton, George E. Hamilton, Jr., and Henry R. Gower, all of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

STEPHENS, Associate Justice.

These cases were brought in the Supreme Court of the District of Columbia to recover for injuries alleged to have been caused by the negligence of the appellee, defendant below, Baltimore & Ohio Railroad Company. In case No. 6463, the appellant, plaintiff below, Edith Hopkins, non compos mentis, sued by her aunt and next friend, Elizabeth F. Campbell. In case No. 6464, the appellant, plaintiff below, Elizabeth F. Campbell, sued as administratrix of the estate of Ida M. Hopkins, deceased. Ida M. Hopkins was the mother of Edith Hopkins. The cases were consolidated for trial and are consolidated on appeal.[1] They are crossing accident cases.

According to the evidence, Chestnut Street, crossing the District of Columbia line from Takoma Park, Md., is shortly thereafter itself crossed at grade by the tracks of the appellee. At about 11:15 o'clock on the night of October 26, 1929, Mrs. Hopkins and Edith Hopkins, her daughter, together with a Mrs. Johnson, who was at the wheel, were driving on Chestnut Street from Takoma Park, Md., into Washington, in a 1924 model T Ford sedan, and at the grade crossing alluded to in the District of Columbia, a collision occurred between their automobile and an express train of the appellee. Mrs. Johnson and Mrs. Hopkins were killed. Edith Hopkins was seriously injured, and is as a result in St. Elizabeth's Hospital for the Insane. The collision is the same as the one out of which arose the cases of Campbell v. District of Columbia and Hopkins v. District of Columbia, decided in this court May 20, 1935, 64 App.D.C. 375, 78 F.(2d) 725.

The declarations charge that the appellee was negligent in the following particulars: Failing to give sufficient notice of the existence and location of the railroad crossing; failing to keep a vigilant lookout; failing to give reasonable warning of the approach of the train, in view of the allegedly dangerous nature of the crossing; failing to operate the train at a reasonable rate of speed, in view of the na-

---

1 For convenience they will be referred to herein as if they were but one case.

ture of the crossing; and failing to keep the train under control and to exercise emergency control at the time the automobile was about to cross the tracks. The actions were tried to a jury. At the close of the plaintiffs' case, a motion for a directed verdict was made by the defendant, and by the court granted, and judgment of dismissal was entered thereon. The appeal is from that judgment. The only assignment of error is that attacking the action of the trial court in directing the verdict; the only points made under this assignment are that there was sufficient evidence of negligence on the part of the defendant for submission to the jury, and that there was no evidence of negligence on the part of the driver of the automobile, and that, even if there had been the question whether this was the sole cause of the collision was for the jury, not for the court, to decide.

Was there sufficient evidence of negligence on the part of the defendant to take the case to the jury? The evidence is without dispute that: Chestnut Street approached the railroad crossing, in the direction of the District of Columbia, at somewhat less than a right angle, although a short distance before actually reaching the tracks, it jogged a little to the right so that the immediate crossing of the tracks was at approximately 90 degrees. The rails were flush with the street. To the right of the approach, as one drives from Takoma Park, Md., towards the District, view of the tracks was obstructed by an embankment, and view of a coming train—it was from the right that the train came—by the same embankment, by a house and barn, trees and shrubs, and to some extent also by the watchman's box, and, on the night of the accident, by cars parked in a vacant lot adjacent to the tracks. There were two railroad tracks, one for trains leaving Washington for the West and one for trains approaching Washington, as was the train in question. The track leaving Washington was on the side of the right of way toward Maryland and therefore had to be crossed first by one driving toward the city. There was much train traffic at this crossing—according to testimony most favorable to appellants—in the neighborhood of 51 trains daily and 17 nightly, this being the main line of the appellee to the West; and there was much pedestrian and vehicular traffic on Chestnut Street, as many as 320 vehicles by day and a good many pedestrians, including, in the daytime, school children. The railroad company allowed some of its trains a speed of 55 miles per hour over the crossing; the express train in question, 41.4 miles.

The precautionary devices installed by the appellee at this crossing at the time of the accident consisted of the following: There was a flashlight signal device on a pole on each side of the tracks, each device having one lamp facing in the direction of Washington—to warn those coming from Washington, and one facing toward Takoma Park, Md.—to warn those going toward Washington; the lamps, on each side of the tracks, flashed alternately, in red; they operated electrically, commencing when an approaching train, reaching a point 4,656 feet away, closed a circuit there located; the lamps continued to flash until the train passed the crossing; the electrical operation was by commercial current, but there was a storage battery also which automatically furnished current if the commercial service failed; the flash lamps were 7 feet 6 inches from the ground. On the District of Columbia side of the tracks on the same pole as the flash lamps was a 12-inch gong, or bell, operated on the same circuit with the flash lamps and put in operation in the same manner. On the flash-lamp poles, on each side of the track, was a cross-buck crossing sign with the words "Railroad Crossing" thereon. The poles were striped black and white, the cross-arms were white with the letters black. In the daytime the appellee kept a flagman at the crossing, but he went off duty at 6 o'clock p. m. There were also on each side of the tracks bright electric street lights, put up by the District of Columbia; the one on the Maryland side hung above and a little back of the crossing sign as one approached it. At the time of the accident these devices were all in place and operating, that is, the lamps were flashing, the gong ringing, the cross-buck signs with the lettering thereon were in place, the street lights were burning.

As the train approached the crossing the engineer gave two long and two short blasts of the engine whistle. He also started the engine bell ringing by turning a valve which kept it ringing until turned off, and the bell continued to ring until the train came to a stop after the collision. The engine had a headlight enabling the engineer to see objects 2,500 to 3,000 feet ahead. The tracks were straight. The night was clear. The engineer, seated on the right side of the cab, could see the

Chestnut Street crossing until he got within an engine length or so thereof. The speed was 40 miles per hour. The engineer first noticed a grinding as if he had hit something, when the engine was about the middle of the crossing. He stopped the train of 23 cars with the rear end three or four car-lengths from the crossing, towards Washington. This, according to the only testimony on the subject, was a good stop at the speed mentioned, for a 23-car train.

The fireman was on the left side of the engine cab and could see the crossing, and he saw no automobile thereon up to the time the engine was 40 or 50 feet away. At that moment a heavy lump of coal falling down onto the "apron" rolled against his foot and he got off his seat and turned to replace it, and then the crash came. Thus no one saw the actual collision, and only one person saw the automobile as it approached the crossing. This was a woman, Mrs. Rose Blanch Fort, who was in the middle of Chestnut Street on the Washington side of the tracks. She saw the headlights of the automobile, then the train darted between her and them, and then she heard a noise. The facts above set forth are, as said, not in dispute.

Appellants assert that the case should have gone to the jury because of evidence from which the jury might have found that the cross-buck sign, the crossing bell, and the flash lamps were ineffective as warnings, and that the engine whistle was blown too late to give adequate warning.

As to the whistle: The evidence showed without dispute that there was a whistling post set 1,216 feet from the railroad crossing at the Washington side of an overhead bridge (sometimes referred to as a subway) going to a school called the Bliss Electrical School. The engineer stated, according to the record, "that he blew the whistle for that crossing just after they passed the North Takoma Station * * * that North Takoma Station is about 500 or 600 feet above the Chestnut Street crossing maybe further than that; that the overhead bridge at the Bliss Electrical School is a little above that, and that is generally where they blow the whistle for that crossing * * *." The fireman testified "that the whistle was blown at the whistle crossing and was sounded until they were right close to the crossing; that they were about 200 or 300

feet from the crossing when the whistle was first sounded * * *." He also stated that "Silver Springs is less than a mile from the Chestnut Street crossing * * * after leaving Silver Springs he remembers the overhead bridge at the Bliss Electrical School; that the whistling post is at the Washington side of the overhead bridge going to the Bliss Electrical School. [He] never had occasion to ascertain how far that was from the Chestnut Street crossing. The engineer blew his whistle for the Chestnut Street crossing when he got to that whistling post * * * he gave two long blasts and two short blasts * * * the train was running all the time those blasts were being given * * * at the end of the short blast of the whistle the train was right about the crossing * * *." The witness Ella A. Aery, who lived on Chestnut Street in "the last one [house] before you get to the tracks on the right hand side coming into Washington * * *," stated that the engine "first blew for the crossing then the bell rang * * *." As to the bell, the engineer testified "that he started the bell ringing as he came over the subway; that there were some men working there and he notified these men to get off; that this was at Silver Springs, Maryland * * *."

The statement of the fireman "that they were about 200 or 300 feet from the crossing when the whistle was first sounded * * *" is what the appellants especially rely upon in respect of the alleged inadequacy of the warning by whistle. Apparently they interpret the word "crossing" in that statement as meaning the railroad crossing rather than the "whistle crossing," as the fireman called it. We think this hardly a reasonable construction in view of the whole of his statement, and that on the contrary it clearly appears therefrom that the fireman meant that the whistle was blown at the whistle crossing, i. e., the whistling post, or near there, at approximately 1,216 feet away from the railroad crossing and sounded until the engine was within 200 or 300 feet thereof. And we think that from all of the testimony on the subject of the whistle, it must reasonably be concluded, not that it was first blown as late as 200 or 300 feet from the railroad crossing, but on the contrary, on the engineer's estimate of the distance of the North Takoma Station from the crossing, not less than 500 or 600 feet from the latter. Even this seems a some-

what strained view as against the appellee, for the engineer's "500 or 600 feet above the Chestnut Street crossing maybe further than that * * *" is obviously but an estimate. There is no dispute that the whistling post was 1,216 feet away, the fireman's testimony clearly fixed that point for the sounding of the whistle, the engineer fixed the subway as the place where he commenced ringing the bell, and Mrs. Aery said that the whistle preceded the bell.

The flash lamps: These, though concededly in place and operating at the time of the accident, are asserted by the appellants to have been ineffective because automobiles of the model driven by Mrs. Johnson had a sun visor which would obscure a view of the lamps. This claim is based on photographs taken from a similar car at 45 and 75 paces from the flash lamps with a kodak held up to the eye of one in the driver's seat, upon photographs taken from the rear seat, and upon testimony that the visor would obstruct view of the lamps from a tall person (the witness was 6 feet 2 inches) sitting erect in a natural driving position. We think this evidence too highly speculative to take the case to the jury. There was no testimony that Mrs. Johnson was tall, or that she was sitting erect, or that the camera was held at the height of her eye when she was driving the car.

The crossing bell: The testimony bearing upon the sufficiency of the crossing bell came from many sources. There is no dispute but that it automatically commenced ringing when the train reached a point 4,656 feet away and that it was ringing at the time of the accident. Mrs. Fort, who lived in the vicinity, said that the bell (she referred to it as "the bell" or "bells") "made quite a lot of noise * * *" but she did "not think she could hear it in her house with her windows closed. She could hear it when she was outside of her house. It was a tinkling bell." She said that "when they started ringing for a train they consist of a continuous tinkling tone, and that it keeps up until the train passes over the crossing * * * that when she would be in her house if she stopped and listened she could hear the bells; that she can hear the bells when the windows are open; that she can hear them when sitting on her front porch * * * that when she first went to live in this house the bells annoyed her greatly. After she lived there

a while she became accustomed to them * * *." Another witness, Frederick Hawkes, who lived about a half a block away, said that the crossing bell "was quite audible and was a ringing intermittent bell * * *"; that he had noticed it ringing "when a train was not in the block * * *." He also said that "if the windows of his car were not closed and he was paying attention he could hear the bells ringing from Takoma Avenue down to the crossing * * *." This, according to the record, was 415 feet. Mrs. Aery, above referred to, whose house was the last on the right as one approaches the crossing and about 75 yards from the tracks, "was not positive that she could hear the [crossing] bells when the house was closed but she could hear them very distinctly when the house was open * * *." She said that "she had gone over the crossing at night in an automobile and * * * could * * * hear the [crossing] bell ringing * * *." The assistant division engineer of the appellee, Henry W. Routenberg, testified that "when driving down Chestnut Street towards the crossing in an automobile the [crossing] bells could be heard ringing at a distance of probably five or six city squares * * *" and probably better at night. Still another witness, James Clinton Ambler, who lived near the Chestnut street crossing in the house right across from the watchman's box and who, during October, 1929, took his meals with Mrs. Aery, his sister, and who had approached the crossing in an automobile many times when the crossing bell was ringing, could not hear it, while the motor was running, in a car of the same model as that Mrs. Johnson was driving, but could hear it if he stopped. Appellants say also that there was, according to the record, another car in the street at the time of the accident with the motor running. This we assume. Appellants also rely on testimony that it was a cold night—the lowest temperature was 40 degrees, at 11 o'clock it was 48 degrees—from which they infer that the windows of the car Mrs. Johnson was driving were closed.

We think there is nothing in the above from which it could reasonably be found that the crossing bell was inadequate. It is speculative to infer that the car windows were closed. With three people in the car, a more probable conclusion would be to the contrary. Both conclusions are

little more than guesses. How noisy or quiet the other car in the street was is without proof, as is the amount of noise made by Mrs. Johnson's model T Ford compared with that of the witness Ambler. That the bell could not be heard indoors with the windows closed is not pertinent. Those inside houses are not in danger of trains and due care does not require warnings to reach them. The item that the crossing bell had been heard to ring when trains were not in the block is of no force in the face of the testimony, and the concession, that it did ring when this train approached. There is no showing that Mrs. Johnson lived near the crossing and was lulled into ignoring the crossing bell by irregularity of its action.

The cross-buck sign and lettering: The assertion here made by the appellants is not that the sign and lettering were as such insufficient but that the glare of the street light made it difficult to see them. Photographic exhibits in evidence show the pole, cross-buck and lettering to be conspicuous by day. Frederick Hawkes, above mentioned, who had driven over the crossing often, said that the sign "was not particularly distinctive because of the location of the electric street light with respect to it; that he had noticed this condition on more than one occasion." He stated that the light was slightly behind the crossing sign and above it and that because it was above it "obscured the reading on the front of the sign as you approached it * * * that in approaching the crossing * * * in his automobile he could not read the letters plainly on the sign * * * that the District light * * * eliminated the type of the sign and shortened the arms so that it was difficult to see that it was a cross; that the cross arms could be dimly seen * * *." Mrs. Aery stated that she was not sure she could see the sign from her porch, but she had gone over the crossing at night and could see the sign in crossing. The division engineer stated that the electric light did not interfere with reading the face of the sign, that he had made tests to determine whether it interfered with the vision of the pole and the sign on it, and that it did not, but illuminated it. The witness Llewellyn Jordan, a resident of the neighborhood who had made a study of the crossing conditions with a view to elimina-

tion of the grade crossing, though he had never driven over the crossing at night but had walked by it, admitted that there was a cross-arm sign there as well as the District of Columbia lights.

■ We think this testimony not sufficient to go to the jury on the question of the adequacy of the cross-arm sign and lettering as a warning. Assuming the accuracy of such of the testimony as is most favorable to the appellants, it indicates only that the lettering was eliminated from vision, not the sign as a whole; it was but obscured. Moreover, a railroad is not obliged in the use of due care to have its night warnings visible by day and its day warnings visible by night. A cross-arm sign and lettering are primarily daytime warnings, and if in some degree visible by night add to, rather than detract from, the night warnings.

■ It is of course the rule on a motion for a directed verdict that the evidence must be "construed most favorably to the plaintiff * * *." Thomas R. Riley Lumber Co. v. McHarg, 47 App.D.C. 389, 390. But this does not mean that there must be put upon the plaintiff's evidence a strained construction. The plaintiff must be given "the advantage of every inference *fairly* deducible from all the testimony * * *." Idem. The trial judge must give "full effect to every *legitimate* inference * * *." Dodge v. Rush, 28 App.D.C. 149, 154. As said by the United States Supreme Court, a directed verdict is to be granted when "the evidence, with all the inferences, that *justifiably* could be drawn from it, does not constitute a sufficient basis for a verdict * * *.[2] A mere scintilla of evidence is not enough to require the submission of an issue to the jury. The decisions establish a more reasonable rule 'that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.' [Authorities cited.]" Gunning v. Cooley, 281 U.S. 90, 93, 94, 50 S.Ct. 231, 233, 74 L.Ed. 720. We think the trial court in the case at bar correctly ruled that there was insufficient evidence to go to the jury, either on the special items

---

[2] Quoted from Slocum v. New York Life Insurance Co., 228 U.S. 364, 369, 33 S.Ct. 523, 57 L.Ed. 879, Ann.Cas.1914D, 1029.

(Italics in the above quotations are supplied.)

of evidence above discussed, or on the case as a whole—that reasonable jurymen must have concluded that the appellee was not negligent as charged by the appellants. In terms of the specific charges of negligence: The crossing bell and the flash lamps, aided by the cross-buck sign, gave ample notice of the existence of the crossing. The engineer and fireman were at their posts keeping a lookout, with an adequate headlight. The distraction of the fireman's attention, by the falling lump of coal, occurred when the engine was almost upon the crossing—too late for effective action even if the approaching automobile had been seen. The crossing bell, the flash lamps, the engine bell, and the whistle gave ample warning of the approach of the train. The speed was not unreasonable in view of the many warnings. The train was not out of control. We think that the evidence fairly construed leads necessarily to these conclusions.

In terms of the third charge of negligence—failing to give reasonable warning of the approach of the train, in view of the allegedly dangerous nature of the crossing—appellants specifically rely upon Grand Trunk Railway Company v. Ives, 144 U.S. 408, 12 S.Ct. 679, 36 L.Ed. 485. They urge that that case lays down an absolute rule that in respect of dangerous crossings it is always for the jury to say whether, in the exercise of due care, a flagman is required. We think the Ives case does not lay down in absolute terms such a rule. The Supreme Court in that case itself recognized that where all reasonable men must draw the same conclusions from the facts, the case is one for the court so far as the question of due care generally is concerned. See 144 U.S. 408, page 417, 12 S.Ct. 679, 36 L.Ed. 485. And in the statement expressly relied upon in reference to the particular question whether it is for the jury alone to say whether due care requires a flagman, the Court again recognized that the rule is not absolute. It said: *"As a general rule,* it may be said that whether ordinary care or reasonable prudence requires a railroad company to keep a flagman stationed at a crossing that is especially dangerous, is a question of fact for a jury to determine, under all the circumstances of the case, and that the omission to station a flagman at a dangerous crossing *may be taken into account* as evidence of negligence; although in some cases it has been held that it is a question of law for the court." 144 U.S. 408, page 421, 12

S.Ct. 679, 684, 36 L.Ed. 485. (Italics supplied.) In the Ives case, moreover, the facts required the case to go to the jury. While the view was obstructed, as in the instant case, there was unanimity in the Ives case among the plaintiff's witnesses that the engine whistle was not blown and the engine bell not rung, and there was a division among the defendant's witnesses on this subject. Also there was nothing in the case concerning such warnings as existed in the instant case in addition to the engine whistle and bell, that is, flashing lamps, a crossing bell, and a cross-arm sign of at least some value. It is to be noted, moreover, that in the Ives case the proposition that it is for the jury to determine whether a flagman is necessary is especially made contingent on its being first shown [of course in a manner sufficient for jury consideration] that the "crossing is more than ordinarily hazardous: As, for instance, that it is in a thickly populated portion of a town or city; or, that the view of the track is obstructed either by the company itself or by other objects proper in themselves; or, that the crossing is a much traveled one and the noise of approaching trains is rendered indistinct *and the ordinary signals difficult to be heard* by reason of bustle and confusion incident to railway or other business; *or, by reason of some such like cause:* and that a jury would not be warranted in saying that a railroad company should maintain those extra precautions at ordinary crossings in the country." 144 U.S. 408, page 421, 12 S.Ct. 679, 684, 36 L.Ed. 485. (Italics supplied.) By a hazardous crossing as defined in the Ives case is apparently meant one in which the usual precautions will not suffice to give warning.

The crossing in the instant case is not a country crossing, but we think it cannot be said to be, within the Ives case definition, a dangerous one. The "ordinary signals" were not rendered difficult to be heard or seen. Whether a jury can properly find a crossing dangerous depends upon the particular facts in each case, and in the instant case, because of the many precautions taken, we think it could not. Whether a crossing is dangerous is not to be determined by the naked condition of the crossing—the existence of devices to warn against danger must be considered. We think that in view of the many warnings provided in the instant case, reasonable men would not find a flagman also necessary. We think that the Ives case is not controlling, that it is distinguishable on the

facts, and that it is not categorically to the effect that the need of a flagman is a jury question solely.

We think it unnecessary to comment at length upon the other cases cited by the appellants for this proposition. None of them, in our view, lays down the absolute rule urged and each is so different upon the facts as not to be persuasive. In Panama Railroad Company v. Pigott, 254 U. S. 552, 41 S.Ct. 199, 65 L.Ed. 400, there was evidence that no warning was given by engine bell or whistle, and no mention is made of any other warnings, and in that case the engine was backing a box car without a lookout. In Northern Pac. Ry. Co. v. Moe (C.C.A.) 13 F.(2d) 377, there were five tracks at the crossing, and trains going in opposite directions often passed each other. The court held that there was a question for the jury whether the railroad owed a duty to the deceased "to have a flagman, gates, a gong, or some other method of warning to travelers, in addition to any signals that the approaching train might have given * * *" (13 F.(2d) 377, page 379), and also held that since the facts showed a crossing that was "especially dangerous * * * no error was committed in refusing to charge the jury that there was no issue of negligence for them to decide as to the lack of a flagman *or some other adequate warning* * * *." 13 F.(2d) 377, pages 379, 380. (Italics supplied.) This is far from saying that where there are other adequate warnings—a flash lamp, a crossing bell, a cross-arm sign of at least some value, and an engine bell and whistle—it is for the jury alone to determine whether a flagman also is necessary. In Kinghorn v. Pennsylvania R. Co. (C.C.A.) 47 F.(2d) 588, there was a conflict as to whether the engine bell was rung and the whistle blown long enough before the accident to be effective as warnings, and the charge held correct was not one permitting the jury to say whether a flagman was necessary when, as at bar, other signals were given, but permitting it to say whether the defendant was negligent "in failing to maintain *a signal* at the crossing to warn travelers * * *." 47 F.(2d) 588, page 590. (Italics supplied.) In Quill v. New York Cent. & H. R. R. Co., 16 Daly, 313, 11 N. Y.S. 80, there was a flagman. The jury was charged that if they believed the stationing of the flagman to warn persons of approaching danger was sufficient for that purpose, negligence could not be imputed to the defendant because of its failure to provide other means for the same end. This was of course held proper.

Appellants assert that it is the rule in the federal courts that where trains go over a crossing at high rates of speed, a jury should determine whether the signals from the train alone were sufficient. It is to be noted that if this is the rule, it is not apropos because in the instant case there were not only signals from the train but also other signals. Appellants cite Canadian Pac. Ry. Co. v. Slayton (C.C.A.) 29 F. (2d) 687, and quote from the opinion at page 688 as follows: "The speed should not be so great as to render unavailing the warning of its whistle, bell, or light, particularly where warning of the headlight is modified by another stationary electric light lamp in close proximity to the crossing, and where interfering objects prevent those who are approaching the railroad from seeing the oncoming train. If speed is desired, a watchman operating the gates should be stationed at the crossing while such trains are operated." But this quotation is inapplicable, because in the instant case the warning of the train by bell and whistle was not modified, and there were also the flash lamps, the crossing bell, and with partial effectiveness at least the cross-arm sign. Also, in the case cited there were railroad gates which were raised, and the court held, in respect of a driver unfamiliar with the crossing, that they constituted an invitation to cross with an implied assurance that no train was approaching, which assurance he might to some extent rely upon. Moreover, in the Slayton case the court also said: "The test is the particular danger of the crossing, even though it be in a village. N. P. Ry. Co. v. Moe (C.C.A.) 13 F.(2d) 377. The question is *usually* one of fact for the jury." 29 F. (2d) 687, page 688. (Italics supplied.) Norfolk & W. Ry. Co. v. Holbrook (C. C.A.) 27 F.(2d) 326, is relied on for its holding that it was for the jury to find whether the character and extent of the traffic and the extent and kind of obstacles which obstructed the view were in their composite effect such as to require the railroad "to maintain some special warning signals at this crossing if it wished to run its train at the customary high speed, and that lacking such protection for highway travelers, the speed was negligent." But in the instant case there were special warnings. In St. Louis Southwestern Ry. Co. of Texas v. Lewis (Tex.Civ.App.) 297 S.W. 896, there was evidence that the railroad had made no provision at the cross-

ing for warning persons when a train was approaching, and there was a conflict as to whether a statute requiring the whistle to be blown and the locomotive bell to be rung had been complied with, and there was evidence that the train was traveling 25 or 30 miles per hour. The court held that under such circumstances the jury had a right to say whether those in charge of the train were guilty of negligence in operating it at that rate of speed. The court also held that the evidence [exclusive of the question of the speed of the train, which on motion for rehearing it was held improper to submit to the jury on this point] warranted a jury in finding that the crossing was an unusually dangerous one and that the railroad was therefore guilty of negligence in failing to have "a flagman, watchman, gates, bell, or gong." 297 S.W. 896, page 898.[3]

Our conclusion that the trial court correctly ruled that there was no evidence of negligence on the part of the appellee for the jury's consideration and that it therefore properly granted the motion for a directed verdict is determinative of the case. Therefore we do not pass upon the points made by the appellants that there was no evidence of negligence on the part of the driver of the automobile, and that even if there had been the question whether this was the sole cause of the collision was for the jury, not for the court, to decide. The judgment of the trial court is therefore, in each of the two causes consolidated, affirmed.

---

[3] This case was later reversed because of consideration by the jury of improper matters. (Commission of Appeals of Texas) 5 S.W.(2d) 765.

